**LINAN–FAYE CONSTRUCTION CO., INC., Plaintiff,**

v.

**HOUSING AUTHORITY OF the CITY OF CAMDEN, Defendant.**

Civ. A. No. 90–4651 (JEI).

United States District Court, D. New Jersey.

March 15, 1994.

As Amended March 23, 1994.

Lundy, Flitter & Beldecos, P.A. by Cary L. Flitter, Cherry Hill, NJ, for plaintiff.

Freeman, Zeller & Bryant by Mark D. Caswell, Cherry Hill, NJ, for defendant.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

IRENAS, District Judge:

Plaintiff and defendant entered into an ill-fated contract for the renovation of a Camden housing project. Almost immediately, the parties became embroiled in disputes over project specifications. At one point, the defendant attempted to rebid the project, which led to litigation and a temporary settlement between the parties. Ultimately, the defendant opted to terminate the contract rather than persist in the disputes. Plaintiff then filed suit in this Court, seeking specific performance of the contract and damages for alleged pre- and post-termination breaches.

In previous summary judgment motions, we dismissed the plaintiff's count under 42 U.S.C. § 1983 and found that plaintiff's damages under the contract were limited by the termination for convenience clause incorporated in the contract documents. We left open the possibility, however, that plaintiff might be able to recover damages attributable to a delay in labelling the termination as one of convenience. We now find that (1) plaintiff may not recover damages arising from a delay in labelling the termination as one of convenience; (2) damages arising from pre-termination breaches are subsumed within the termination for convenience clause; and (3) defendant is not liable for any damages arising from its decision not to relinquish plaintiff's performance bonds during the pendency of the plaintiff's action for specific performance. We also find that the expenses allegedly incurred by the plaintiff are not compensable under the termination for convenience clause. Therefore, we will grant the defendant's motion for summary judgment.

## I. FACTUAL BACKGROUND

On or about August 11, 1988, the Housing Authority of the City of Camden ("HACC") let out and advertised for bid a housing modernization project known as "Occupied Unit Rehabilitation—Peter J. McGuire Gardens NJ 10–4" (the "project"). The project involved the renovation and rehabilitation of 244 housing units, which would be funded by the United States Department of Housing and Urban Development ("HUD") through HACC.

Plaintiff Linan–Faye Construction Co., Inc. ("Linan–Faye") submitted a sealed bid in the sum of $4,264,000.00 together with supporting documentation, which included a bid bond, a performance bond, a qualification statement, and various required affidavits. Linan–Faye also attended all required "pre-bid" meetings.

Plaintiff was the "lowest responsible bidder" for the job, underbidding its nearest competitor by some $600,000.00. Accordingly, on September 30, 1988, James Norton, Modernization Officer of the HACC, sent a formal notice of award to Linan–Faye, and advised the plaintiff that "[c]ontracts for the above captioned modernization work will be forthcoming." Letter of Norton to Linan–Faye of 9/30/88.

Plaintiff engaged in preparatory activities in connection with the contract, including meeting with prospective subcontractors, job planning and pricing, and securing insurance. Representatives from Linan–Faye also met on several occasions with HACC and its ar-

chitect, The Bruner Firm ("Bruner"), to discuss the details and specifications of the project and make preparations for the commencement of work. However, Linan–Faye never began the physical renovation of the buildings.

Disputes arose between the parties between October and November of 1988.[1] Plaintiff contends that HACC demanded "numerous give-backs and concessions before permitting Linan to start work." Complaint at ¶ 10. Defendant, on the other hand, maintains that the parties arrived at different interpretations of the project plans and specifications, the conflict of which became evident at preconstruction meetings. Whatever the cause of the discord, it prompted HACC to rethink its relationship with Linan–Faye. Consequently, on November 29, 1988, Linan–Faye was advised by Bruner that the McGuire Gardens project would be rebid.

On December 20, 1988, Linan–Faye filed a complaint and order to show cause to enjoin the rebidding and allow it to complete the project "as bid." On December 21, 1988, this Court entered a Temporary Restraining Order to prevent HACC from accepting further bids. On January 29, 1989, the Court approved a Stipulation of Settlement and Order of Dismissal with Prejudice, by which the parties agreed to execute the contracts and proceed with the project as originally planned. Paragraph 2 of the order emphasized that:

Nothing herein shall be construed to interpret nor pass upon the language of the contract, nor the obligations of the respective parties thereunder; nor shall this Stipulation and Order be construed to alter or amend the contract terms.

Stipulation of Settlement and Order of Dismissal with Prejudice of 1/23/89 at ¶ 2.[2]

The settlement agreement was but a temporary cessation of hostilities, and disputes soon broke out again. Plaintiff refused to begin construction, insisting that it "would not and could not commence construction until it received, *inter alia*, a fully signed Contract and a Notice to Proceed." Complaint at 17. Defendant alleges that plaintiff presented numerous problems or potential problems that it insisted be resolved by HACC before it would start work, and that it was this quibbling that delayed issuance of the Notice to Proceed.

HACC issued a Notice to Proceed on November 22, 1989. Despite language which indicated its generality,[3] plaintiff contends that the notice was in fact restricted to certain plumbing problems that were but a portion of the original contract. Linan–Faye refused to proceed in a piecemeal fashion, and insisted that it would not begin work until a certain number of vacant buildings were available at the same time so that it could achieve economies of scale.[4]

HACC attempted first to extract the plumbing segment from the contract and, when that failed, proposed a complete buyout of Linan–Faye's contract. The parties entertained the possibility of a buy-out from early 1990 until July of that year, at which time HUD informed HACC that it would not

1. The genesis of several of these disputes is seen in the minutes of the preconstruction meetings. For example, in the minutes of the October 26, 1988 meeting, the following exchange is noted:

Contractor says that he has bid the price of the job with the assumption of wall repair as being wall preparation. He did not include a price of 50% allowance for wall repair.... He failed to realize during the bidding period, despite numerous conversations on the same issue, that the Owner wanted a general repair price. He claimed that a price could not be determined and that he assumed minimal work.

Meeting Minutes of October 26, 1988 at 2. Apparently, plaintiff determined to bid as conservatively as possible, and make up the difference between the bid price and the actual cost of construction by seeking equitable adjustments during the pendency of the project.

2. Plaintiff alleges that it signed all of the required contract documents by January 5, 1989, but did not receive a copy countersigned by the defendant until November 29, 1989.

3. You may take this letter as your official Notice to Proceed effective 12/1/89, in a manner such as to complete all work specified in the Bid Documents and in accordance with the (365) day calendar day time limit for this work which is 12/1/90.

Notice to Proceed of 11/22/89.

4. HACC responded that it had scattered vacant units, but not rows of vacancies.

approve a buy-out. By letter of July 23, 1990, HACC reinstated the previous Notice to Proceed and set a starting date thirty days hence.

At a preconstruction meeting on September 6, 1990, Linan–Faye informed HACC that it would not start work until the contract price was increased to reflect the costs incurred by the delay in commencing construction. HACC responded that Linan–Faye had to begin work before the price increase issue could be addressed. Linan–Faye still refused to begin work, and HACC looked for ways to terminate the contract.

The General Conditions to the Contract ("General Conditions") signed between the parties provided two avenues by which a contract could be terminated. Paragraph 16 governed terminations for default of the contractor, while ¶ 17 governed "terminations for convenience":

> a. Subject to the approval of HUD, the performance of work under this contract may be terminated by the PHA [public housing agency] in accordance with this paragraph in whole, or from time to time in part, *whenever the Contracting Officer shall determine that such termination is in the best interest of the PHA.* Any such termination shall be effected by delivery to the Contractor of a Notice of Termination specifying the extent to which the performance of the work under the contract is terminated, and the date upon which such termination becomes effective.
>
> b. If the performance of the work is terminated, either in whole or in part, the PHA shall be liable to the Contractor for reasonable and proper costs of termination, which costs shall be paid to the Contractor within 90 days of receipt by the PHA of a properly presented claim setting out in detail (1) the total cost of the work performed to date of termination less the total amount of contract payments made to the contractor; (2) the cost (including reasonable profit) of settling and paying claims under subcontracts and material or-

ders for work performed and materials and supplies delivered to the site, payment for which has not been made by the PHA to the Contractor or by the Contractor to the subcontractor or supplier; (3) the cost of preserving and protecting the work already performed until the PHA or assignee takes possession thereof or assumes responsibility therefor; (4) the actual or estimated cost of legal or accounting services reasonably necessary to prepare and present the termination claim to the PHA; and (5) an amount constituting a reasonable profit on the value of the work performed by the Contractor....

General Conditions at ¶ 17 (emphasis added).[5]

HACC elected to terminate Linan–Faye's contract and did so by letter dated September 25, 1990. While the letter never mentioned the terms "breach" or "default," it did note that Linan–Faye "had continually failed to demonstrate its intent to perform under the public contract as awarded pursuant to the laws of the State of New Jersey." Letter from Kern to Faye of 9/25/90.

Linan–Faye objected to the termination, and filed the instant suit on October 26, 1990. The complaint set forth theories of recovery under New Jersey public contracts law and 42 U.S.C. § 1983. In July of 1991, defendant moved to rebid the project, and plaintiff again sought to obtain a temporary restraining order. The court denied the motion, finding that monetary damages would be sufficient to compensate the plaintiff for any losses suffered.

In April 1992, defendant filed a motion for partial summary judgment as to plaintiff's civil rights claim. Defendant also argued in that motion that the "termination for convenience" clause set forth at ¶ 17 of the General Conditions operated to limit the damages recoverable by plaintiff under the contract. On August 21, 1992, the Court granted HACC's motion for summary judgment as to the plaintiff's § 1983 claims. Order of August 21, 1993; *see also* Opinion of August 24,

---

**5.** The General Conditions also provided that disputes arising from either form of termination were to be settled by presenting the dispute to the Contracting Officer, who would then render a decision "with reasonable promptness, after obtaining the approval of HUD." General Conditions at ¶ 14.

1993. However, we declined to rule on the effect of the termination for convenience clause, preferring to wait until further discovery had been completed.

In March of 1993, HACC renewed its motion for partial summary judgment as to the applicability and effect of the termination for convenience clause. On April 23, 1993, this Court granted the motion for summary judgment, limiting plaintiff's damages to those recoverable under the termination for convenience clause, but leaving open the possibility of recovery for damages accruing from defendant's failure to specifically identify the termination as one of convenience. The decisions were certified by the Court for interlocutory appeal to the Third Circuit, but plaintiff's petition to file such an appeal was denied.

On October 27, 1993, defendant filed its third motion for summary judgment, contending that since plaintiff "never began work under the Contract, never having mobilized the site," Defendant's Brief in Support at 3, it could not recover damages under the termination for convenience clause. Plaintiff responded that (1) it had incurred preparatory costs (e.g., soliciting subcontractors, pricing, preconstruction meetings) within the ambit of ¶ 17; (2) it could recover damages resulting from the faulty termination notice; (3) it could recover damages for pre-termination delay; and (4) it could recover damages resulting from HACC's refusal to relinquish plaintiff's performance bonds.

## II. LEGAL ANALYSIS

### A. *Choice of Law*

■ The Maguire Gardens renovation project was funded by the Public and Indian Housing Comprehensive Improvement Assistance Program ("CIAP"), which in turn is administered by the United States Department of Housing and Urban Development through a series of federal statutes and regulations. *See, e.g.*, 42 U.S.C. § 1437*l*; 24 C.F.R. 968.101 *et seq.* The regulations require that contracts entered into pursuant to the CIAP contain certain provisions. 24 C.F.R. § 968.110(j). These provisions, which are collected in the Uniform Requirements for Grants and Cooperative Agreements to State, Local, and Federally Recognized Indian Tribal Governments (the "Uniform Requirements"), 24 C.F.R. § 85.1 *et seq.*, include a requirement that all CIAP contracts in excess of $10,000.00 incorporate a termination for convenience clause. 24 C.F.R. § 85.36(i)(2).

Section 85.36(b) of the regulations permits grantees, such as the HACC in this case, to use applicable state and local procurement laws and regulations, "provided that the procurements conform to applicable Federal law and the standards identified in this section." 24 C.F.R. § 85.36(b). Plaintiff reasons from this provision that New Jersey law should govern interpretation of the termination for convenience clause. However, to paraphrase the plaintiff, this is a considerable and unnecessary leap in logic with which this Court cannot agree.

The text of § 85.36(b) expressly limits its applicability to state and local procurement laws and regulations. Nothing suggests it is a general choice-of-law provision, or that the federal government has any interest in mandating that the vagaries of fifty distinct state laws, rather than the federal common law, be applied to interpret a clause required by federal regulation to be included in contracts for construction projects around the country.

■ Whether state or federal law applies to disputes brought under the court's diversity jurisdiction depends upon the degree to which the outcome will affect the interests of the federal government.[6] *Bank*

---

**6.** The Supreme Court has recognized the need and authority in some limited areas to formulate what has come to be known as federal common law.... These instances are few and restricted ... and fall into essentially two categories: those in which a federal rule of decision is necessary to protect uniquely federal interests ... and those in which Congress has given the courts power to develop substantive law.
*Texas Industries, Inc. v. Radcliffe Materials, Inc.*, 451 U.S. 630, 640, 101 S.Ct. 2061, 2067, 68 L.Ed.2d 500 (1981). The parties have not cited any Congressional enactment granting the federal courts the power to create substantive law in the area. Therefore, our inquiry is confined to whether the matter should be governed by feder-

of America National Trust & Savings v. Parnell, 352 U.S. 29, 77 S.Ct. 119, 1 L.Ed.2d 93 (1956). The application of federal law is appropriate where "a uniform national rule" is necessary to further federal interests. Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943), or where "there is significant conflict between some federal policy or interest and the use of state law." Miree v. DeKalb County, 433 U.S. 25, 31, 97 S.Ct. 2490, 2495, 53 L.Ed.2d 557 (1977) (quoting Wallis v. Pan American Petroleum Corp., 384 U.S. 63, 86 S.Ct. 1301, 16 L.Ed.2d 369 (1966)); cf. Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 457, 77 S.Ct. 912, 918, 1 L.Ed.2d 972 (1956) ("It is not uncommon for federal courts to fashion federal law where federal rights are concerned.").

◼ In diversity cases involving contract disputes, the federal courts ordinarily apply state law. See generally Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); Eugene F. Scoles and Peter Hay, Conflict of Laws § 3.52 (1984). And while federal law governs the rights and obligations of the United States under government contracts, United States v. Seckinger, 397 U.S. 203, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970), state law often governs the construction of contracts between government contractors and their subcontractors. See, e.g., American Pipe & Steel Corp. v. Firestone Tire & Rubber Co., 292 F.2d 640 (9th Cir. 1961); Peter Kiewit Sons' Co. v. Summit Construction Co., 422 F.2d 242 (8th Cir. 1969); 1A Moore's Federal Practice § 0.321 (1980). However, where the dispute implicates significant federal interests, resolution will be accomplished by resort to federal law. American Pipe & Steel Corp., 292 F.2d at 644; United States v. Taylor, 333 F.2d 633

(5th Cir.1964), adhered to on reh'g., 336 F.2d 149 (5th Cir.1964). See generally Whittaker Corp. v. Calspan Corp., 810 F.Supp. 457, 462 (W.D.N.Y.1992); Grinnell Fire Protection Systems Company, Inc. v. Regents of the University of California, 554 F.Supp. 495, 497-98 (N.D.Cal.1982).

◼ We find that the extensive statutory and regulatory framework governing the administration of CIAP projects nationwide, together with the reality that these projects are funded almost entirely by the federal government, lead to the conclusion that the interpretation of provisions required to be included in CIAP contracts is a uniquely federal concern. The CIAP regulations extend into all areas of project management, from financial administration and recordkeeping to contract requirements. See generally 24 C.F.R. Part 85 (containing uniform administrative rules for grants and cooperative agreements); Part 968 (setting forth regulations addressing public housing modernization).

In fact, contracts entered into pursuant to the CIAP are almost, if not entirely, prescribed by the federal government. The contract documents in the instant case, for example, comprise two HUD forms—the General Conditions of the Contract and the Supplement thereto. In light of the pervasive regulatory and financial influence of the federal government, and the nationwide scope of the CIAP program, we conclude that there is a uniquely federal interest in a uniform interpretation of provisions, like the termination for convenience clause, that are required to be included in contracts entered into pursuant to the program.

al common law because it involves a uniquely federal interest.

In Boyle v. United Technologies Corp., 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), the Supreme Court set forth a two-pronged inquiry for determining the propriety of applying federal common law in the absence of a Congressional grant of authority. The court must first inquire into whether the action implicates "uniquely federal interests," id. at 504, 108 S.Ct. at 2514, defined in an earlier case as areas "where there is an overriding federal interest in the need for a uniform rule of decision or where the controver-

sy touches basic interests of federalism." Illinois v. City of Milwaukee, 406 U.S. 91, 105-06 n. 6, 92 S.Ct. 1385, 1393-94 n. 6, 31 L.Ed.2d 712. If this question is answered in the affirmative, the court must then determine whether a "significant conflict" exists between an identifiable federal policy or interest and the application of state law to the dispute, or whether the application of state law would frustrate specific objectives of federal legislation. Boyle, 487 U.S. at 507, 108 S.Ct. at 2516; see also Texas Industries, 451 U.S. at 640, 101 S.Ct. at 2066-67.

■ That a lawsuit involves a uniquely federal interest, however, does not by itself authorize the federal courts to employ federal common law in its resolution. "That merely establishes a necessary, not a sufficient, condition for the displacement of state law." *Boyle v. United Technologies Corp.*, 487 U.S. 500, 507, 108 S.Ct. 2510, 2516, 101 L.Ed.2d 442 (1988). "Displacement will only occur where ... a 'significant conflict' exists between an identifiable 'federal policy or interest and the [operation] of state law ... or the application of state law would 'frustrate specific objectives' of federal legislation. . . ." *Id.*) (citations omitted); *see also Wallis v. Pan American Petroleum Corp.*, 384 U.S. 63, 68, 86 S.Ct. 1301, 1304, 16 L.Ed.2d 369 (1966) (noting that, in deciding whether to fashion rules of federal common law, "normally the guiding principle is [the existence of] a significant conflict between some federal policy or interest and the use of state law"); *but cf. Miree v. DeKalb County*, 433 U.S. 25, 31, 97 S.Ct. 2490, 2495, 53 L.Ed.2d 557 (1977) (noting that uniform national law should not be employed in disputes in which no federal interest is promoted).

■ We find it implausible that the federal government would require all CIAP contracts in excess of $10,000.00 to contain a termination for convenience clause, and then leave interpretation of that clause to the vagaries of state law, particularly where, like New Jersey, there are few or no state law cases interpreting this type of provision. Rather, we believe that the decision to include a termination for convenience clause in the "Uniform Requirements" section of the C.F.R. reflects a federal interest in a consistent interpretation of that clause. We therefore find it appropriate to use federal common law to discern the scope and effect of the termination for convenience clause.

Even assuming that New Jersey law were to apply, we have no basis for believing that New Jersey courts would look elsewhere than to the federal common law for guidance. As a preliminary matter, we note the sheer absence of New Jersey case law on point. Moreover, we think that courts in New Jersey would recognize that where the parties have incorporated a particular clause pursuant to federal regulation, they do so against the backdrop of federal case law addressing the clause. Therefore, we believe that New Jersey courts would draw from this rich body of federal common law, unless to do so would violate some enshrined principle of New Jersey law.

Plaintiff contends that federal common law and the law of New Jersey are at odds. We disagree, having found no indication that the general principles of New Jersey contract law upon which the plaintiff relies—such as the notion that the "government must 'turn square corners' rather than exploit litigational or bargaining advantages," *W.V. Pangborne & Co. v. New Jersey Dept. of Transportation*, 116 N.J. 543, 561, 562 A.2d 222 (1989)—are any different than those used by courts applying federal common law. *Cf. Maxima Corporation v. United States*, 847 F.2d 1549 (Fed.Cir.1988) (refusing to allow government to invoke termination for convenience clause where other party had already completed its obligations under the contract); *Kalvar Corporation v. United States*, 543 F.2d 1298, 1301–03, 211 Ct.Cl. 192 (1976) (recognizing that government may not act in bad faith in employing the convenience-termination clause) and cases cited therein.

### B. Termination for Convenience Clauses

#### 1. History

■ An exception to the common-law requirement of mutuality of contract is the doctrine of termination for convenience, by which the Government is permitted to terminate contracts when it determines that it would be in its interest to do so, without incurring a breach. When a contracting officer invokes the doctrine, the contractor's recovery is limited to costs incurred on the work performed, a reasonable profit based on the value of the work performed, and costs incurred in preparing the termination settlement proposal. Significantly, the contractor is precluded from recovering anticipated profits, which "confers a major contracting right on the government with no commensurate advantage to the contractor." Ralph Cibinic & John Nash, *Administration of Government Contracts* 817 (1985).

The concept of termination for the convenience of the Government arose in response to the massive procurement efforts that accompanied major wars. *See generally* Cibinic & Nash, *supra*, at 817–72; Stephen N. Young, Note, *Limiting the Government's Ability to Terminate for Its Convenience Following Torncello*, 52 Geo.Wash.L.Rev. 892 (1984). Although the Government had always had the power to terminate its contracts, exercise of that power would amount to a breach of the contract, unless the government acted pursuant to contractual agreement or statutory right. Convenience termination allowed the government to conclude burdensome contracts by paying for the work performed (including a profit thereon) without having to pay anticipated profits.

A number of regulatory and statutory provisions were developed to resolve questions concerning the breadth of authority to terminate a contract for convenience and the amount of recovery to which the terminated contractor was entitled. *See, e.g., United States v. Speed*, 75 U.S. (8 Wall.) 77, 19 L.Ed. 449 (1868) (discussing Rule 1179 of Army Regulations of 1863, a prototype for the modern termination for convenience doctrine); *United States v. Corliss Steam–Engine Co.*, 91 U.S. 321, 23 L.Ed. 397 (1876) (presenting legal theory that became basis for modern doctrine); 40 Stat. 1272 (1919) (the Dent Act); 58 Stat. 649 (1944) (the Contract Settlement Act). *See generally Torncello v. United States*, 681 F.2d 756, 765–66, 231 Ct.Cl. 20 (1982) (detailing history of usage); Cibinic & Nash, *supra*, at 818–19 (discussing evolution of the Armed Service Procurement Regulations and the Federal Procurement Regulations, later renamed the Federal Acquisition Regulations).

After World War II, termination for convenience clauses were imported into civilian contracts. In 1964, the first edition of the Federal Procurement Regulations contained optional termination for convenience clauses to be used "whenever an agency considered it necessary or desirable." *See* FPR 1–8.700–2 (1964), *quoted in* Cibinic & Nash, *supra*, at 818. The current version of the Federal Acquisition Regulations requires the inclusion of such clauses in a broad variety of government contracts, civilian as well as military. *See* FAR 49.502, 48 C.F.R. § 49.502 (setting forth requirements for inclusion); FAR 52.249–1 to –4, 48 C.F.R. § 52.249–1 to –4 (containing various forms of termination for convenience clause).

### 2. Grounds and Effect

The termination for convenience clause offers no guidance in determining what actions are in "the government's interest." As such, the contracting officer has considerable discretion in deciding when and to what extent a contract may be terminated. Courts have upheld decisions to terminate even for contracts that are "improvident in their origin and which subsequent to their making prove to be onerous or unprofitable for the government." W. Noel Keyes, *Government Contracts under the Federal Acquisition Regulation* § 49.32 (1986), and cases cited therein.[7]

The effect of the termination for convenience clause is most evident in the amount of damages permitted:

> Thus, a contractor's protection on a convenience-termination is that he normally becomes entitled to the cost of the work performed plus a profit thereon and the cost of settling subcontract claims. The principal difference between the sum cal-

---

7. Under the Federal Acquisition Regulations, for example, a termination for convenience is accomplished by delivery to the contractor of a written notice of termination, specifying, *inter alia*, the effective date and the extent of termination. FAR 49.102, 48 C.F.R. § 49.102. Upon receipt of the notice of termination, the contractor is directed to comply with the termination clauses of the contract and any directives contained in the notice of termination. These sections generally require that the contractor stop work, terminate all subcontracts, notify the government of any legal proceedings growing out of

the subcontract, settle his accounts and submit to the contracting officer his termination claim. FAR 49.104, 48 C.F.R. § 49.104.

We emphasize, however, that the contract at issue in this case is not governed by the Federal Acquisition Regulations. Paragraph 14 of the General Conditions of this contract provides that, in the event of any disputes concerning the termination of the contract, the contractor "shall, unless directed otherwise by the Contracting Officer, proceed with the work as directed." General Conditions at ¶ 14(d).

culated under this standard and the amount recoverable in a common law action for breach of contract is the omission in the former of anticipated but unearned profits. This is true even where the government breaches the contract. By agreeing to the termination clause, a contractor relinquishes the common law formula and acquiesces in the substitution of a rule under which profit is only allowed on the work actually performed. Of course, this situation is changed in a "loss" contract because an injured party should not be put in a better position than if the contract had been performed.

Keyes, *supra*, at § 49.32.

### 3. Constructive Application of the Termination for Convenience Clause

The impact of the termination for convenience doctrine was significantly enhanced in the 1963 case of *John Reiner & Co. v. United States*, 325 F.2d 438, 163 Ct.Cl. 381 (1963), *cert. denied*, 377 U.S. 931, 84 S.Ct. 1332, 12 L.Ed.2d 295 (1964). Plaintiff had submitted a bid to the Army Corps of Engineers for the construction of 3,567 generator sets, and the bid was accepted in June of 1956. Plaintiff executed the contract and proceeded to negotiate with suppliers of the main components of the generator sets. Approximately six weeks after receiving the initial acceptance, plaintiff was advised by the government to suspend operations under the contract and inform its suppliers and subcontractors accordingly. The contract with the plaintiff was then cancelled, pursuant to a ruling by the General Accounting Office that the award had been improperly made, and new bids were solicited.

Plaintiff argued that because the government had not expressly relied on the termination for convenience clause in the contract, its actions were a breach of the contract for which plaintiff would seek recovery of full damages. The Court of Claims disagreed, finding that "the failure to invoke the termination [for convenience] article leaves untouched the defendant's right to rely on the damage limitation of that clause." 325 F.2d at 444; *see also Nesbitt v. United States*, 345 F.2d 583, 170 Ct.Cl. 666 (1965), *cert. denied* 383 U.S. 926, 86 S.Ct. 931, 15 L.Ed.2d 846 (1966) (noting that the liability of the government was bounded by the termination for convenience clause, even where the clause was not invoked by the government at the time of termination); *cf. College Point Boat Corp. v. United States*, 267 U.S. 12, 15–16, 45 S.Ct. 199, 200–01, 69 L.Ed. 490 (1925) (holding that a valid ground for termination may be asserted as a defense to a breach action even though the ground may not have been known at the time of cancellation). Similarly, the Court found that defendant's failure to abide by the termination procedures of the Armed Services Procurement Regulations was "ineffective to broaden plaintiff's right of recovery," absent a showing that plaintiff had been injured by the failure to pursue the ASPR procedures. 325 F.2d at 444.

*Reiner* marked the beginning of a new, "constructive" application of the doctrine of termination for convenience. This new version was not found in any statute, but was rather "a judge-made doctrine" applied "when the basis upon which a contract was actually terminated is legally inadequate to justify the action taken." *Maxima Corporation v. United States*, 847 F.2d 1549, 1553 (Fed.Cir.1989); *see also Erwin v. United States*, 19 Cl.Ct. 47, 53 (1989) ("Constructive termination for convenience is a judge-made doctrine that allows an actual breach by the government to be retroactively justified.... This doctrine applies in situations where the government stops or curtails a contractor's performance for reasons that are later found to be questionable or invalid.").

Initially, courts viewed terminations for convenience—actual and constructive—as means of "allocat[ing] the risk of a change in the circumstances of the bargain or in the expectations of the parties." *Torncello*, 681 F.2d at 766. However, the 1974 decision in *Colonial Metals v. United States*, 494 F.2d 1355, 204 Ct.Cl. 320 (1974), allowed the termination for convenience provision to be used as an exculpatory clause, "available for contracts improvident in their origin as for contracts which show to be onerous or unprofitable for the Government." *Id.* 681 F.2d at 767.

The plaintiff in *Colonial Metals* had entered into a contract to supply a definite quantity of copper to the government. However, because plaintiff was a "secondary source supplier" of copper, its prices were noticeably higher than those charged by primary source suppliers. Soon after contracting with Colonial Metals, the government decided to remake the contract with primary source suppliers, and terminated its contract with Colonial Metals. Plaintiff argued that the government's actions amounted to bad faith, in that it "acted in order to obtain elsewhere a better price known at the time of the award to be available." 494 F.2d at 1359. The Court of Claims found that termination to buy elsewhere at a cheaper price "is not improper," and held that the termination of the contract did not amount to a breach. *Id.*

A later decision commented on the significance of *Colonial Metals* as follows:

> It is clear, however, that *Colonial Metals* marked a dramatic departure from the development of convenience termination as a method of risk allocation. It established a new reading of the clause, convenience termination for exculpation.... It is the only decision of this court in which a plaintiff was denied recovery after convenience termination that was based on knowledge acquired before the contract was awarded.

*Torncello v. United States*, 681 F.2d 756, 768, 231 Ct.Cl. 20 (1982).

The twin expansions of the termination for convenience doctrine—its constructive application and its use as an exculpatory clause—prompted a slew of unfavorable commentary. *See generally Torncello*, 681 F.2d at 767 (listing critical articles). Some analysts focused on the sheer absence of legal authority in support of the *Colonial Metals* holding. Others noted the unenviable position into which government contractors were now placed—unable to free themselves from a burdensome government contract, but subject to damage limitations if the government chose to invoke a convenience termination.

Courts began to recede from the high-water mark set in *Colonial Metals* in different ways. In *Torncello v. United States*, 681 F.2d 756, 231 Ct.Cl. 20 (1982), for example, the Court of Claims found that where the government had entered into a contract knowing that it could obtain the services more cheaply from another supplier, and then sought to terminate the contract based on the difference in cost, it had acted in bad faith and could not invoke the constructive termination for convenience clause. *Id.* at 772.

A majority of the *Torncello* court agreed that the government could not construe the termination for convenience clause so as to render the contract illusory. A plurality of the court cited "some kind of change from the circumstances of the bargain or in the expectations of the parties" as one situation where the government could terminate for convenience without rendering the contract illusory. *Id.; see also SMS Data Products Group, Inc. v. United States*, 19 Cl.Ct. 612 (1990).

However, subsequent decisions, while conceding that the government may not use the clause to render the contract illusory, have not uniformly adopted the "changed circumstances" test of the *Torncello* court.[8] A 1990

8. These courts often cite language in *Torncello* stating that its holding was limited to the facts presented. *See, e.g., T.I. Construction Co., Inc. v. Kiewit Eastern Co.*, No. 91–2638, 1992 WL 382306 (E.D.Pa. Dec. 10, 1992), *quoting Torncello*, 681 F.2d at 772.

However, in *Maxima Corporation v. United States*, 847 F.2d 1549 (Fed.Cir.1988), the Federal Circuit cited the "changed circumstances" dicta in refusing to allow the government to invoke the convenience termination clause after plaintiff had completed its obligations under the contract. Plaintiff entered into a contract to provide typing and photocopying services for the government for a one-year period, with two one-year options to renew. More than one year after the term of the contract had expired, the government sought to terminate the contract under the convenience termination clause, so that it would only have to pay for the amount of services actually used, rather than the minimum amounts set forth in the contract. Since the plaintiff had already been paid pursuant to the contract, the government sought reimbursement of that portion of the minimum contractual amount that exceeded the value of the services actually rendered.

The Board of Contract Appeals permitted the termination, and the Court of Appeals for the Federal Circuit reversed. The court noted that other courts "have held that a governmental breach of contract may be construed as a termination for the convenience of the government

decision from the Federal Circuit indicated that *Torncello* "stands for the unremarkable proposition that when the government contracts with a party knowing full well that it will not honor the contract, it cannot avoid a breach claim by adverting to the convenience termination clause." *Salsbury Industries v. United States*, 905 F.2d 1518, 1521 (Fed.Cir. 1990).[9] Courts will examine the business relationship for evidence of bad faith, but will not always require proof of changed circumstances.[10]

## C. The Standard for Summary Judgment and the Issues Presented

Under Fed.R.Civ.P. Rule 56(c), "summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

At the summary judgment stage, it is not the role of the judge to weigh the evidence or to evaluate its credibility, but to determine "whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202. There is no issue for trial unless there is sufficient evidence favoring the nonmoving party such that a reasonable jury could return a verdict for that party. *Id.* A nonmoving party may not rest upon mere allegations, general denials, or vague statements. If the non-moving party's evidence is merely

colorable, or is not significantly probative, summary judgment may be granted. *Bixler v. Central Penn. Teamsters Health & Welfare Fund*, No. 93–7048, 1993 WL 533735 (3d Cir. Dec. 28, 1993); *Trap Rock Indus. Inc. v. Local 825, Int'l Union of Operating Engineers*, 982 F.2d 884, 980–91 (3d Cir.1992).

The substantive law governing the dispute will determine which facts are material, and only disputes over those facts "that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Finally, summary judgment should be granted unless a dispute over a material fact is genuine, which the Court has defined as such that "a reasonable jury could return a verdict for the nonmoving party." *Id.*

■ At the motion for partial summary judgment decided in April of 1993, we left open the possibility that the plaintiff might be able to recover damages attributable to the delay in labelling the termination as one of convenience for the government. However, after reviewing the case law, we have concluded that the government may not be penalized when it labels the termination as one for default and later converts it into one of convenience. Therefore, no damages for a delay in labelling the termination may be awarded. *See, e.g., Kalvar Corp. v. United States*, 543 F.2d 1298, 1304, 211 Ct.Cl. 192 (1976); *Nolan Bros. v. United States*, 405 F.2d 1250, 186 Ct.Cl. 602 (1969); *Nesbitt v. United States*, 345 F.2d 583, 170 Ct.Cl. 666

---

when changed circumstances justify the reallocation of the risk to the contractor," 847 F.2d at 1552, but that "[n]o authority has condoned use of the convenience clause to create a breach retroactively, where there was none, in order to change the government's obligations under a completed contract." *Id.* at 1553–54. The court refused to allow "retroactive termination after full performance." *Id.* at 1554.

*Maxima*'s reliance on changed circumstances seems misplaced in light of *Salsbury Industries v. United States*, 905 F.2d 1518 (Fed.Cir.1990). Today, *Maxima* is cited for the proposition that the government may not invoke the termination for convenience clause after the contractor has completed its obligations.

9. Even were the *Torncello* "changed circumstances" requirement still in force, the deteriora-

tion of the relationship between HACC and Linan–Faye would constitute changed circumstances. *See Embrey v. United States*, 17 Cl.Ct. 617, 624 (1989) (finding that deterioration in business relationship constituted a "change in circumstances" sufficient to permit invocation of the termination for convenience clause).

10. Bad faith on the part of the government is difficult to prove. The court is required to presume that the government acts in good faith, and this presumption is rebutted only by "well nigh irrefragable proof" of bad faith. *Kalvar Corp. v. United States*, 543 F.2d 1298, 1301–02, 211 Ct.Cl. 192 (1977). Plaintiff in this case has presented no evidence of bad faith.

(1965), *cert. denied,* 383 U.S. 926, 86 S.Ct. 931, 15 L.Ed.2d 846 (1966) ("[W]e have held that the failure of the defendant to invoke the convenience-termination clause makes no difference and that clause nevertheless sets the limit to any possible recovery.") (collecting cases); Cibinic & Nash, *supra,* at 817 ("In [constructive termination for convenience] cases the contracting officer elects not to use the clause but is still given the benefit of the clause in limiting the contractor's recovery.").[11]

Three issues, then, are left for resolution in this motion: (1) the effect of the doctrine of constructive termination for convenience on pre-termination breaches; (2) the liability *vel non* of HACC for retaining Linan–Faye's performance bonds during the pendency of the latter's action for specific performance of the contract; and (3) the scope of compensable costs under the HACC contract.

### D. *The Termination for Convenience Clause and Pre-termination Breaches*

It is quite clear that constructive application of the termination for convenience clause would cure any breaches committed by the government in the course of terminating the contract. After all, the primary purpose of convenience-termination is to permit the government to avoid breach while terminating unproductive contracts. The issue raised by the plaintiff is somewhat different: whether a constructive termination for convenience would cure breaches incurred prior to termination, for example, a breach arising from the failure of the government promptly to turn over the site to the contractor.[12]

Originally, the termination for convenience clause was designed to permit the government to relieve itself from burdensome procurement contracts once the *raison d'etre* of the contracts had ceased. The typical example involved a wartime requirements contract which was terminated once the war had ended. However, the expansion of the clause into peacetime and civilian contracts brought with it an expansion of the clause's purpose. Today, the termination for convenience clause operates to allow the government to extricate itself from contractual relationships that have soured, for whatever reason, without quibbling with the contractor as to which party is in default.[13] In addition, by settling disputes pursuant to procedures outlined in the contract, the government is able to cut through the thicket of construction litigation, where the costs of litigation often exceed the amount of damages claimed.

The cases that have addressed the issue of liability for pre-termination breaches have concluded that claims for such damages are subsumed in the termination for convenience clause. For example, in *Nolan Brothers, Inc. v. United States,* 405 F.2d 1250, 186 Ct.Cl. 602 (1969), plaintiff entered into a contract with the Corps of Engineers to construct two rock jetties out into the Gulf of

---

11. *See also* Cibinic & Nash, *supra,* at 820:

> If the contracting officer decides to terminate for convenience, the Government's liability will be admitted and the contractor will recover his incurred costs and profit on work done. If another means of severing the relationship is used, litigation over the obligations of the parties is likely. However, even if the contractor wins such litigation the application of the constructive termination for convenience doctrine will limit his recovery to that permitted under the Termination for Convenience clause. Thus, the Government takes little risk, other than the cost of litigation, in choosing some other means of severing the relationship. If such action is upheld, the contractor's recovery may be limited. *If it is not, the Government pays nothing more than it would have paid had it initially elected to terminate for convenience.*

> *Id.* (emphasis added).

12. We emphasize that in our analysis of this issue we make no finding as to whether the pre-termination conduct of HACC amounted to a breach of any provision of the contract with Linan–Faye.

13. Indeed, convenience terminations are designed exactly for situations like this case. At the very least, plaintiff misinterpreted the architect's specifications for the McGuire Gardens project. The Linan–Faye bid was nearly $600,000 lower than its nearest competitor, which gives us cause to question whether the bids were in fact for equivalent work. And, if the disparity in bid amounts leaves any doubt, Linan–Faye's conduct in the days following its receipt of the project (e.g., its requests for changes to the architect's specifications and its intimations that the bid submitted may have underestimated the actual costs involved) clearly demonstrates the lack of communication between the parties. *See, e.g.,* Meeting Minutes of October 26, 1988 at 2.

Mexico. Numerous difficulties developed, which plaintiff ascribed to the government's provision of faulty design specifications and its misrepresentation of key facts. After one-third of the work had been completed, the government terminated the contract for its convenience. Attempts to settle the matter by negotiation failed, prompting the contracting officer to issue a unilateral determination of what the plaintiff could recover, which plaintiff appealed to the Board of Contract Appeals.

Plaintiff then filed a two-count action in federal court, the first of which addressed the alleged pre-termination breaches committed by the government, and the second of which addressed claims under the termination for convenience clause. The trial commissioner, noting that the first count had not been addressed by the Board of Contract Appeals, ordered a separate, *de novo* trial on that claim, and the government appealed. The Court of Claims framed the issues as (1) whether, in light of the recovery under the termination for convenience clause, it was necessary for the court to consider the various breach claims, and (2) if a trial was determined to be necessary, whether adequate relief could be granted administratively under the contract. 405 F.2d at 1252.

The court found that plaintiff's various theories of recovery were all subsumed under the termination for convenience clause:

> [A]ll the plaintiff is now entitled to is a proper award under the convenience-termination article—the claim covered by the second cause of action—and a separate claim of the kind set forth in the first cause of action no longer exists for the plaintiff.
>
> . . . .
>
> Accordingly, the significant role of the first cause of action in plaintiff's petition is to lay claim to the unearned profits which plaintiff cannot recover under the termination clause. All else is subsumed within the second cause of action testing the administrative award under that article.

405 F.2d at 1252–54. The court noted that, by agreeing to the incorporation of the convenience-termination provision, "the contractor acquiesces in the substitution of a contractual rule under which profit is allowed only on the work actually done." *Id.* at 1254.[14]

A later incarnation of the Court of Claims, the United States Claims Court, has affirmed the *Nolan Brothers* holding that damages for breach are restricted to those allowed under the termination for convenience clause. The plaintiff in *Descon System Ltd. v. United States,* 6 Cl.Ct. 410 (1984), participated in a HUD-sponsored program designed to encourage the private development of factory-produced building systems to meet the nation's housing needs. During the second of three phases outlined in the contract, the government terminated the contract on the grounds of default. The Board of Contract Appeals ruled that Descon had not been in default, and converted the termination into one of convenience. The parties entered into a settlement agreement pursuant to the termination for convenience clause. Thereafter, Descon brought an action in which it claimed damages resulting from the defendant's alleged pre-termination breaches of the contract.

The defendant moved for summary judgment and the Claims Court granted the motion, finding that plaintiff was precluded from receiving compensation for breaches of contract occurring prior to the default termination:

> It is well-settled that because a contractor recovers all its allowable incurred costs plus a profit on those costs, a settlement agreement entered into pursuant to the termination for convenience clause necessarily compensates for any breaches occurring prior to the termination. . . . The termination agreement covered all the relief to which plaintiff was entitled under the contracts' termination for convenience provisions (i.e., plaintiff's incurred costs). . . .

6 Cl.Ct. at 413. The court also found that, irrespective of whether plaintiff character-

---

**14.** *See also id.* 405 F.2d at 1255 ("The result is that the court need never consider the allegations of breach of warranty and of misrepresentation, and that plaintiff is not entitled to any trial on its [breach claims] since it is immaterial whether or not those assertions are true.").

ized its damages as lost profits or consequential damages, such additional compensation was barred by the termination for convenience clause. *Id.* at 414; *see also* Young, *supra,* at 892 ("The constructive use of the [convenience-termination] clause has become so broad that the government is able to exculpate itself from its own prior material breaches on the contract.").

We concur with the reasoning set forth in the *Nolan Brothers* and *Descon* opinions. When plaintiff executed the contract documents, it acknowledged that, were the government to invoke the termination for convenience clause, the plaintiff's remedies for breaches—even those committed prior to the termination—would be restricted to the remedies set forth in the clause itself. "Where the parties have agreed upon the precise method by which damages shall be computed or assessed, the Court is bound by their contract." *Utica Mutual Ins. Co. v. DiDonato,* 187 N.J.Super. 30, 43, 453 A.2d 559 (App.Div.1982). Plaintiff's remedies for breach are therefore circumscribed by ¶ 17 of the contract.[15]

### E. *Liability for Bond Retention*

Plaintiff also argues that, in addition to damages arising from the termination of the contract, it is entitled to damages arising from the failure of HACC to relinquish the performance bonds given to it when the contract documents were executed. Plaintiff contends that this "tying up" of its bonding line effectively prevented it from accepting

other construction contracts, and that HACC should have turned over the bonds until a determination had been made as to plaintiff's claims for specific performance. Defendant responds that plaintiff's request for specific performance required it to hold onto the bonds, and, that once a judicial determination had been made that plaintiff was not entitled to equitable relief, HACC promptly returned the bonds.

The retention of the performance bonds after the termination of the contract was the direct result of plaintiff's decision to seek specific performance.[16] Had the plaintiff succeeded in its quest, the contract would have been reinstated and HACC would have needed the bonds. HACC's decision to keep the bonds during the pendency of the litigation was the logical response to the plaintiff's lawsuit.[17] Once it was determined, in July of 1991, that plaintiff would not receive specific performance, the bonds were promptly surrendered.

We find that plaintiff's actions caused the HACC to hold onto the performance bonds, and that plaintiff may not recover damages for the delay in receiving those bonds. Plaintiff's damages are thus restricted to those recoverable under the termination for convenience clause of the Contract.

### F. *The Scope of Damages Permitted under the Termination for Convenience Clause in the Contract*

The contract between HACC and Linan–Faye allowed five categories of costs to be

---

15. Were we to hold otherwise, government contractors would always be able to argue that the government had committed some action in breach of the contract prior to termination, and that the contractors were therefore entitled to breach damages in addition to damages recoverable under the termination for convenience provision. The litigation that would ensure is precisely what is sought to be avoided by the termination for convenience doctrine.

16. Plaintiff disputes this finding, arguing that HACC promised to return the bonds once the contract had been terminated. In support of its position, it cites language from the termination letter in which Gregory Kern of HACC notes that he instructed the Modernization Office to assist Linan–Faye in reclaiming their bonds. However, the letter of termination was dated September 25, 1990, one month before Linan–Faye filed suit

for specific performance. The decision of the HACC to depart from Mr. Kern's original plan only supports our finding that HACC felt compelled to hold onto the bonds until the Court had disposed of plaintiff's claims for specific performance.

17. Plaintiff argues in its brief that HACC should have surrendered the bonds and that had specific performance been granted, it would have found a way to come up with the requisite bonding. Plaintiff's Brief in Opposition at 15 ("If, as, and when Linan–Faye were to be awarded the contract through specific performance, Linan would be obligated to supply the requisite performance bond."). If Linan–Faye was able to secure additional bonding in the event of an award of specific performance, we find it curious that it was unable to obtain this additional bonding during the pendency of the suit.

recovered in the event of a termination for convenience: (1) the total cost of the "work performed" less any payments made to the contractor; (2) the cost of settling and paying claims under subcontracts and material orders; (3) the cost of preserving and protecting the work performed until the public housing agency took possession of the site; (4) the cost of legal or accounting services reasonably necessary to prepare and present the termination claim; and (5) an amount constituting a reasonable profit on the value of the work performed.

The second, third, and fourth categories are patently inapplicable to the facts of this case. Plaintiff has not presented evidence of subcontracts or material orders. Since no work was performed at the site, plaintiff incurred no preservation expenses. Finally, since plaintiff never presented a termination claim, it has incurred no compensable legal and accounting expenses.

The parties dispute the plaintiff's entitlement to compensation under the first and fifth categories. Defendant argues that since plaintiff "never mobilized the site or began work under the contract," Defendant's Brief in Support at 7, it has incurred no damages that are compensable under the contract. It defines "work performed" as "the work defined by the contract specifications and not the contractor's preparation activities." Defendant's Reply Brief at 6–7.

Plaintiff responds that it completed "extensive" preparatory work, including securing insurance, job planning and pricing, and meeting with subcontractors and HACC officials. It disputes the narrow reading of "work performed" offered by the defendant and argues instead that the term should be interpreted so as to include preparatory work, overhead, and general and administrative costs ("G & A" or "soft costs") incurred in connection with the project.

 The issue, therefore, is whether the term "work performed" in ¶ 17 of the General Conditions to the Contract includes the activities detailed by the plaintiff. The con-

tract documents—which include the General Conditions, the Supplement to the General Conditions, and the Standard Form of Agreement between Owner and Contractor ("AIA 101")—fail to define the term "work." [18] However, we can discern the parties' understanding of the term from the context of the contract documents and the letters between the parties.

The contract documents indicate that "work" refers to the physical completion of the renovation project. For example, ¶ 2, which sets forth the contractor's responsibilities, requires the contractor to "furnish all necessary labor, materials, tools, equipment, water, light, heat, power, transportation, and supervision necessary for performance of the work and shall properly protect it until acceptance by the PHA." General Conditions at ¶ 2(a). Paragraph 22 allows the contractor to request from the architect such drawings and supplementary information "which will benefit in the planning and production of the work." *Id.* at ¶ 22. Paragraphs 26 and 29 details the activities that must be undertaken by the contractor to protect the "work completed to date." *Id.* at ¶¶ 26, 29. Finally, paragraph 35 sets forth the warranty of construction as to the "work done." *Id.* at 35.

The contract documents also reference a commencement date for "work under the contract." Paragraph 31 provides that the contractor will furnish appropriate documentation of insurance coverage to the Public Housing Agency "[b]efore commencing work." General Conditions at ¶ 31. Paragraph 7 requires the contractor to submit a completion schedule "within five days after the work commences on the contract." *Id.* at ¶ 7. Paragraph 8 then sets forth a schedule for progress payments, providing that preparation of estimates for these payments may involve consideration of "acceptable work in place, material delivered to and properly stored on the site, and preparatory work." *Id.* at ¶ 8.

Paragraph 8 is the only provision in the contract that addresses compensation for

---

**18.** AIA 101 defines the work to be performed as "the entire work described in the contract documents," while the General Conditions and the

Supplement defines work as "the work to be performed under the contract."

preparatory work, and it does so in the context of payments for work performed. We interpret this provision to mean that while a contractor may be able to recover some expenses incurred prior to the start of physical labor, (1) such expenses are prorated over the life of the contract, and (2) such expenses are recoverable only if the contractor begins the physical construction required under the contract.

The preparatory activities detailed by Linan–Faye in its brief in opposition to the summary judgment motion are not recoverable as "work performed" under the termination for convenience clause. For one thing, ¶ 31 requires the procurement of insurance "[b]efore commencing work." It cannot therefore be considered part of the work performed. Nor can plaintiff recover for costs associated with the planning, pricing, and meetings with subcontractors, HACC officials, and the project architect, since those are preparatory costs that would have been recoverable under ¶ 8 only after the plaintiff commenced work.[19]

To allow the plaintiff to recover preparatory costs and unabsorbed overhead where physical construction never started would, in effect, allow the plaintiff to recover expectancy damages. When a contractor submits a bid for a fixed-price contract, he bids on the entire job, and not on its constituent parts (materials, labor, overhead, etc.). Even the breakdown that is used to calculate progress payments does not reflect the actual costs involved, but rather serves to ensure that progress payments reflect the percentage of the work (calculated as a percentage of the bid price) completed.

The bid is the contractor's estimate of the total costs involved in the completion of the project, including overhead and G & A expenses, plus a margin of profit. If the contractor bids successfully, he will recover costs, overhead, and profit as the work is performed and progress payments are received.[20] However, if the contractor does not bid well, he will recover considerably less, and may even lose money on the project. In short, recovery of profits and soft costs is not guaranteed, but is instead dependent on the contractor's ability to predict accurately the costs of the project.

Where physical construction has commenced, the task of valuing the work performed is exceedingly complex. In addition to the value of the structures completed, the evaluator may also consider costs incurred especially for the project, such as equipment rentals. In those circumstances, the contractor may be able to realize a portion of his overhead expenses, and perhaps even some profit, from the amount given to him for the work performed.

However, where the work has not begun, the process of valuation is greatly simplified because all claims are for expectancy damages. When plaintiff requests unabsorbed overhead costs but has not begun work on the project, what plaintiff in fact requests is that we compensate it for that which it would

---

**19.** The letters exchanged between the parties reinforce our conclusion that Linan–Faye failed to commence work under the contract, a necessary prerequisite to the recovery of overhead expenses and other soft costs. In its letter of July 23, 1990, HACC reminded Linan–Faye that a notice to proceed with the work under the contract had been sent, and that HACC expected it "to begin work on the site" within thirty days. Letter from HACC to Linan–Faye dated July 23, 1990. Linan–Faye responded that it would not commence construction because "the site was not ready for work." Letter of Linan–Faye to HACC dated July 30, 1990. In the letters that follow, the parties dickered over what adjustments would have to be made to the site before Linan–Faye would commence construction. Finally, in a letter dated September 14, 1990, Linan–Faye insisted that HACC finalize certain changes to the contract scope *"before* work begins." Letter of

Linan–Faye to HACC dated September 14, 1990 (emphasis in original). These letters confirm our finding that both parties understood "work," as the term was used in the contract, to refer to the physical renovation of the housing project and not to the preparatory activities now claimed by plaintiff. Cf. Cibinic & Nash, *supra,* at 845 ("One major limitation on costs recoverable in a termination settlement is that the costs must be incurred in performing work authorized by the contract.").

**20.** Another type of construction contract, the "cost-plus" contract, allows the contractor to recover the out-of-pocket costs incurred plus a percentage of those costs for overhead and profit. However, even in a cost-plus contract, the contractor can recover overhead and profit only to the extent that the work *is* actually performed.

have received had the project been started and "work" actually performed. Overhead expenses in this case are expectancy damages, which may not be awarded under the termination for convenience clause.[21]

Profit and soft costs are not in and of themselves work. Rather, they are something that the contractor may recover if it does the work required by the contract. Since plaintiff has presented no evidence that it ever commenced physical construction, it is not entitled to the recovery of unabsorbed overhead or preparatory costs under the contract. Plaintiff has failed to adduce evidence of any costs incurred that are compensable under the termination for convenience clause.[22] Defendant's motion for summary judgment will therefore be granted.

For the reasons set forth above,

**IT IS** on this 15th day of March, 1994,

**ORDERED** that the defendant's motion for summary judgment be, and the same hereby is, **GRANTED.**

---

21. The case cited by plaintiff, *Southwestern Engineering Co. v. Cajun Electric–Power Cooperative, Inc.*, 915 F.2d 972 (5th Cir.1990), is easily distinguishable. In that case, plaintiff entered into two contracts to design and manufacture power plant components for a utility company. Plaintiff started work on the contract, but completion was hampered by several lengthy delays caused by the utility company. After plaintiff had completed 60% of the engineering work and ordered materials to fabricate the products (i.e., after commencing work under the particular contract), the utility company terminated for its convenience.

The court allowed plaintiff to recover pre-termination unabsorbed overhead costs incurred during the delays, based on a provision in the contract that expressly provided for such payments. No such provision is present in the case at bar, nor did HACC suspend or delay performance after construction on the contract had commenced. *Southwestern Engineering* is therefore inapplicable to this case.

22. We recognize that there may be situations in which a contractor who incurs costs directly attributable to the performance of the work should equitably be able to recover those costs, even though incurred prior to commencing "work" under the contract. For example, the contractor may have leased or purchased goods or equipment specifically identifiable to the particular contract, or may have entered into binding subcontracts in connection with the contract which would compel the contractor to pay damages upon a termination for convenience. In fact, the latter situation is provided for in the termination for convenience clause of the instant contract. *See* General Conditions at ¶ 17.

Plaintiff in the instant case has presented no evidence of expenses that would merit an equitable adjustment to the contract. The G & A expenses incurred prior to the termination arose either from (1) preliminary consultations with potential subcontractors or (2) conversations with the HACC and its architect, either to "clarify" the project specifications or to discuss increases to the contract price.