Per Curiam:
This case comes before the court on defendant’s motion, filed January 22, 1974, requesting that the court adopt the recommended decision of Trial Judge David Schwartz, filed November 23, 1973, pursuant to Buie 166(c), on plaintiff’s motion and defendant’s cross-motion for summary judgment, as the basis for its judgment in *324 i.bi.g case since plaintiff has failed to file a request for review by the court of the said decision in accordance with the Rules of the court. Upon consideration thereof, without oral argument, since the court agrees with the decision, as hereinafter set forth, it hereby affirms and adopts the same as the basis for its judgment in this case. Therefore, defendant’s motion of January 22, 1974, is granted, plaintiff’s motion for summary judgment is denied, defendant’s cross-motion for summary judgment is granted and plaintiff’s petition is dismissed.
OPINION OP TRIAL JUDGE
Schwartz, Trial Judge:
This is a suit to review a decision of the Armed Services Board of Contract Appeals awarding $250 on plaintiff’s claim for $123,059 as the allowable costs on the Government’s termination for convenience of a contract to sell copper ingot to the Navy. A second count raises the claim, dismissed by the Board as beyond its jurisdiction, that the termination-for-convenience clause was invoked for an improper purpose and therefore constituted a breach of contract.
The parties have made cross-motions for summary judgment on both counts, thereby presenting the entire case for final disposition. Both counts are to be disposed of on the record made in the administrative proceeding; United States v. Carlo Bianchi & Co., 373 U.S. 709, 714 (1963), so holds for the count to review the Board action and an agreement of the parties so provides for the count for breach of contract. The review of the Board’s decision takes place in accordance with the standards of the Wunderlich Act, 41 U.S.C. §§ 821-22, by which the Board’s findings of fact are final if supported by substantial evidence and its decisions of law are open to fresh consideration.
The Navy’s invitation to bid, issued in late 1969, asked for the supply of 479,607 lbs. of copper ingot in May 1970. Plaintiff, a secondary dealer in copper, was the only bidder, and on December 24,1969 was awarded the contract, at the bid price of $.7838 per lb.
The invitation had also sought bids on a further 440,000 lbs., set aside under Armed Services Procurement Regulation *325 1-804.2(b), 32 CFB § 1.804-2(b) (1970), for supply by concerns in labor surplus areas. Plaintiff was qualified as such a concern. Immediately following the award, a Navy procurement officer and an officer of the plaintiff had a telephone conversation in which the plaintiff claims the parties concluded an oral contract for the additional, set-aside quantity; the Board held to the contrary.
A week later, on December 31,1969, plaintiff ordered 960,-000 lbs. of May 1970 copper from Aaron Ferer & Sons Co. for $.7225 per lb., to fulfill the basic contract and the claimed contract for the additional, set-aside quantity.
On January 20,1970 the Government terminated the basic contract for its convenience, under the contract clause on that subject, and thereafter it denied the making of a contract for the set-aside quantity. Between January 27 and March 12 the Government bought the copper it needed from primary sources — leading copper mining companies — at between $.55 and $.56 per lb. The purpose of the termination was to obtain the prices, much lower than the contract price, at which copper is sold by the primary sources. Their prices are common knowledge, regularly published. The purpose and circumstances of the termination are the basis of plaintiff’s claim of breach of contract.
Immediately upon the termination, plaintiff cancelled its purchase order with the Ferer firm for purposes of the Government contract, simultaneously replaced the order for its own account, and thereafter, in April 1970, sold the copper for more than it had paid for it but less than the price in the contract with the Navy. In a termination costs proceeding, the Board allowed neither profit on the contract with the Government nor loss on the contract with Ferer.
The questions presented are whether the parties made a contract for the additional set-aside quantity; whether the termination for convenience was a breach of contract; and whether the Board wrongly failed to award, in the termination settlement proceeding, profit on the Government contract and losses on the Ferer contract. All these questions are herein answered in the negative, against the plaintiff.

*326
The Alleged Contract for the Set-Aside Quantity

The threshold issue is the scope of the contract to be considered — whether it included the additional 440,000 lbs. of ingot set aside for specially qualified bidders, of whom plaintiff was one.
When the notice of award for the basic non-set-aside quantity had been mailed to plaintiff, a Mr. Hoover, a Navy procurement officer, called Mr. Mann, plaintiff’s executive vice president, told him of the award, and inquired whether plaintiff would be interested in an award of the set-aside quantity. On the basis of what then was said over the telephone, plaintiff maintains that an oral contract was concluded or “implied in fact.” Alternatively, it is contended that the Government is equitably estopped to deny the existence of a contract, because in reliance on the representations made by Mr. Hoover, an agent clothed with apparent authority, plaintiff on December 31, 1969 bought 960,000 lbs. of copper ingot, to make delivery of both the basic and the set-aside quantities.
The Board accepted none of these arguments. Mr. Hoover did not, the Board found, purport to make an award of contract for the set-aside quantity; at most he assured Mr. Mann that plaintiff would receive an award subject to prior approval at a higher level. The Board further found that Mr. Hoover did not have and did not expressly or by implication represent that he had authority to award a contract.
Depositions by both participants to the telephone conversation were made a part of the record. Mr. Hoover testified that he called Mr. Mann, asked whether plaintiff would be interested in the set-aside quantity; that Mr. Mann said plaintiff would be interested; that they then had a little bit of discussion as to “whether a new contract would be issued, or whether the existing contract would be modified. And I indicated to him that it would be handled by a modification, but it would take several days to get it out because of necessary internal approvals.” Mr. Hoover added that “We had every intention at that time to award the set-aside portion to plaintiff.”
Mr. Mann’s version was that when he told Mr. Hoover that plaintiff was interested, “He said, okay, that we have *327 the contract and the set-aside, but it would take a couple of days to get the papers out.”
Mr. Hoover was not a contracting officer with authority to contract but a lesser officer called a procurement officer, subordinate to the contracting officer. In talking to Mr. Mann he did not identify himself other than, Mr. Mann said, to say he was calling from the Government procurement office “with regard to that particular contract.” He was authorized, the Board found, only to inquire as to plaintiff’s interest in the set-aside quantity, and he did not pretend to any higher status or authority.
The evidence amply supports the finding and conclusion that no contract was made.
The finding that Mr. Hoover referred to a necessary prior approval at a higher level is supported by the testimony quoted above. Such words, in a discussion of an agreement, are reasonably to be understood as stating a condition that further action by others is necessary before an agreement may be regarded as reached. Cutler-Hammer, Inc. v. United States, 194 Ct. Cl. 788, 794-95, 441 F. 2d 1179, 1182-83 (1971); 1 CORBIN on contracts § 11 at 25 (1963). Thus no contract was concluded.
The findings negate all the theories advanced by plaintiff. Express contract is directly contradicted by the findings. Contract implied in fact is a doctrine applicable to a meeting of the minds, inferred without explicit words from the conduct of the parties as showing their tacit understanding. Balt. & Ohio R.R. v. United States, 261 U.S. 592, 597 (1923). It can have no application where the explicit words actually used express the thought that agreement is conditional. And any notion of contract by estoppel is dispelled by the absence, here, of the representation and reasonable reliance indispensable for the application of an estoppel. Manloading & Management Associates, Inc. v. United States, 198 Ct. Cl. 628, 461 F. 2d 1299 (1972) ; Emeco Industries, Inc. v. United States, 202 Ct. Cl. 1006, 1013-15, 485 F. 2d 652, 657-59 (1973).
A final theory of the plaintiff is that in a set-aside contract the Government is not, as in ordinary contracts, the offeree of an offer contained in a bid, but rather an offeror (a theory *328 for which, plaintiff cites 41 Comp. Gen. 230,234 (1961)), and that here, in the telephone conversation, the Government made an offer and the plaintiff accepted it. Assuming that the theory is sound, and the Government in such contracts is the offeror, Mr. Hoover’s explicit reference to the need for further approvals prevented what he said from being understood as an offer which could on acceptance create a binding agreement. “So long as it is reasonably apparent that some further act of the offeror is necessary, the offeree has no power to create contractual relations by an act of his own, and there is as yet no operative offer.” 1 coRbin on contracts, supra § 11 at 25.
The disposition on the facts of the claim of oral contract makes it unnecessary to consider either the force of the statement, on the face page of the invitation, in a blank box headed “Award,” that “Award will be made on this form, or on Standard Form 26, or by other official written notice,” or the provisions of statute and regulation that a contract award is to be made in writing. 10 U.S.C. § 2305 (c) (1970); 41 U.S.C. §253 (1970); ASPR 2-407.1, 32 CFR §2.407-1 (1970); see G. C. Casebolt Co. v. United States, 190 Ct. Cl. 783, 789-90, 421 F. 2d 710, 714 (1970) (concurring op.).
The issue of the scope of the contract is decided against plaintiff. The only contract between the parties was one for the non-set-aside quantity, purported to be terminated by the Government for its convenience on January 20, 1970.

Validity of the Termination for Convenience

The termination for convenience is said to have been an act of bad faith and thus a breach entitling plaintiff to common law breach damages, because the Government acted in order to obtain elsewhere a better price known at the time of the award to be available.
Such a motive for a termination for convenience is not improper, and the termination is held not to be a breach. This conclusion makes it unnecessary to consider the Government’s contention, perhaps analytically antecedent to the question decided, that even if there were a breach, it would have been “subsumed” or transformed into a convenience- *329 termination under such cases as Nolan Bros., Inc. v. United States, 186 Ct. Cl. 602, 405 F. 2d 1250 (1969); G. C. Caselolt Co. v. United States, supra; and Nesbitt v. United States, 170 Ct. Cl. 666, 345 F. 2d 583 (1965), cert. denied, 383 U.S. 926 (1966).
The contract was awarded on December 24,1969, to plaintiff, the sole bidder, at the bid price of $.7838 per lb. It was terminated within the month, on January 20,1970, in order, the Board found, that the Government might procure the copper from primary sources at lower prices — as low as $.55 per lb. Soon after the contract was terminated, the contracting officer entered into “rated” contracts with three primary sources, sales companies for leading copper mining concerns, for copper at between $.55 and $.56 per lb.[1] The reasons why such primary sources did not bid do not appear. It is also not explained in the record why the contracting officer did not withhold the award to plaintiff and do immediately what he eventually did — negotiate rated contracts with the primary sources, at their prevailing low prices. Quotations of the price of copper from primary sources, to be found in the Wall Street Journal and trade papers, are common knowledge. It may be that the contracting officer did not share in the common knowledge of the price of copper futures. The Government urges that common knowledge cannot be imputed to it, and suggests that the officer may not have been aware, at the time of the award, of rated orders as a method of procurement from sources which do not bid on a published invitation.[2] The only fact we can be sure of is that, as the Board found, the Government terminated to get a better price from *330 another source, a price which the Government throughout knew or ought to have known was readily available.[3]
The convenience-termination clause provides for termination “whenever the contracting officer shall determine that such termination is in the best interest of the Government.” [4] It is designed to provide a mechanism whereby the Government may end its obligation on a contract and yet limit its liability to the contractor’s costs and profits on the preparations made and work done. G. L. Christian & Associates v. United States, 160 Ct. Cl. 1, 11, 15-17, 312 F. 2d 418, 423, 426-27, rehearing denied, 160 Ct. Cl. 58, 320 F. 2d 345, cert. denied, 375 U.S. 954 (1963). It may well be, as plaintiff argues, that the Government does not promote confidence in its procurement process when it terminates a contract and deprives the contractor of the profits of the bargain, for reasons which were known at the time of the award. But the determination of the interest and convenience of the Government is by the contract clause left to the discretion of the contracting officer.
The language of the clause gives the contracting officer the “fullest of discretion to end the work” in the interest of the Government. Nolan Bros., Inc. v. United States, supra, 186 Ct. Cl. at 606, 405 F. 2d at 1253; Schlesinger v. United States, 182 a. Cl. 571, 581, 390 F. 2d 702, 707 (1968). The discretion may be exercised in a “host of variable and unspecified situations.” (John Reiner & Co. v. United States, 163 Ct. Cl. 381, 390, 325 F. 2d 438, 442 (1963), cert. denied, 377 U.S. 931 (1964) (termination to avoid a conflict with the Comptroller General); cf. Schlesinger v. United States, supra (to avoid a dispute with Congress). Particularly *331 comparable to the instant case are the judicially approved terminations where the Government’s purpose was to end a dispute in which the contractor maintained that he has been damaged by faulty plans (Nolan Bros., Inc. v. United States, supra) or to employ a rival contractor with greater production facilities (Nesbitt v. United States, supra).
Monetary profit or other benefit to the Government is the common theme of all these terminations. “The defendant could properly wish to cut unnecessary losses as early as possible and to consider what drastic changes might be needed in its plans.” Nolan Bros., Inc. v. United States, supra, 186 Ct. Cl. at 606, 405 F. 2d at 1253.
Termination to buy elsewhere at a cheaper price is essentially such a termination as has repeatedly been approved. The added element that the contracting officer knew of the better price elsewhere when he awarded the contract to plaintiff — in the absence of some proof of malice or conspiracy against the plaintiff (cf. Librach v. United States, 147 Ct. Cl. 605, 612-14 (1959)) — means only that the contract was awarded improvidently and does not narrow the right to terminate. The clause is not designed to perpetuate error, but to permit its rectification.
Termination for convenience is as available for contracts improvident in their origin as for contracts which supervening events show to be onerous or unprofitable for the Government. Absent bad faith, therefore, or some other wrong to the plaintiff or illegal conduct such as does not here appear, the Government alone is the judge of its best interest in terminating a contract for convenience, pursuant to the discretionary power reserved by the clause to the Government’s contracting officer. Accordingly, no breach took place by the termination, and the plaintiff became entitled only to the costs and profits allowed on a termination for convenience.

The Claims for Termination Costs

To fulfill its contract for the sale of copper to the Government at $.7838 per lb., plaintiff on December 31,1969 placed an order with Aaron Ferer & Sons Co., a copper firm in Nebraska, for copper ingot at $.7225 per lb. On January 20, 1970, when the contract was terminated, plaintiff in a letter *332 to Ferer cancelled the order for purposes of the terminated contract and in the same letter reordered the copper for its own account. The stipulated market price of copper was then $.6590 per lb., a sum less than the contract price. The following April 30 plaintiff sold the copper for $.7585, more than it had paid for it, but still less than the contract price.
Before the Board, plaintiff claimed, as its lost profit on the contract with the Government, the difference between the contract price of $.7838 and its purchase price of $.7225, or $.0613 per lb. times the contract quantity, and as its costs or loss on the settlement of the Ferer contract, an additional $.0635 per lb., the difference between its purchase price from Ferer of $.7225 and $.6590, the market price of copper on the day of the cancellation and reorder.
The Board disallowed both items of damages. It held that the copper had been retained for plaintiff’s own account; that there was no evidence of a loss or of a settlement of a subcontractor’s claim allowable in a termination settlement; and, generally, that plaintiff had failed to meet its burden of proof of any costs beyond the $250 allowed by the termination contracting officer. These rulings were correct and are adopted.
The regulation incorporated into the contract clause on convenience-termination provides that anticipatory profits shall not be allowed in the settlement of termination costs. ASPE 8-303(a), 32 CFft § 8.303 (a) (1970). Plaintiff would avoid the regulation by a contention that its lost profits were not anticipatory but rather fixed and certain. Once it had the award of the contract to sell copper to the Government for $.7838 and had placed the order with Ferer to buy at $.7225, plaintiff says, the profits were fixed and certain — “only the date of payment was anticipatory.”
The contention is without substance. The profit was “anticipatory” because it was unearned, unrealized and contingent on the completion of the transaction. The avoidance of Government liability for the profit from the transaction were it to be completed — the profit which is awarded as damages in an action for breach of contract — was almost the *333 whole purpose of the convenience-termination clause. G. L. Christian & Associates v. United States, supra; Nolan Bros., Inc. v. United States, supra, 186 Ct. Cl. at 608, 405 F. 2d at 1254. The profit contended for is thus the very anticipatory profit whose payment in a convenience-termination settlement is forbidden by the cited regulation. William, Green Constr. Co. v. United States, 201 Ct. Cl. 616, 626-27, 477 F. 2d 930, 936-37 (1973).
As for the Ferer contract, there was neither loss nor payment on its settlement recognizable in a convenience-termination proceeding. The purported termination by plaintiff of its contract to buy copper from Ferer was a termination in form only. Plaintiff’s letter of termination cancelled its purchase order insofar as the Government contract was concerned, and retained the purchase order in effect for plaintiff’s own account. The copper was, as the Board held, retained for plaintiff’s own account.
The regulations provide that the cost of items reasonably usable in the contractor’s other work is not allowed, and that contemporary purchases of common items by the contractor is evidence that such items are reasonably usable by the contractor. ASPE 15-205.42(a), 32 CFE § 15.205^2(a) (1970). The retention of the copper for plaintiff’s own account was of course a demonstration that the copper was usable by the plaintiff in its other work. Plaintiff maintains that copper ingot plays no part in its regular work; but it made dealing in copper ingot part of its work when it reordered for its own account.
Moreover, when plaintiff cancelled the order of purchase from Ferer and simultaneously reordered for its own account, at the same price, it recouped the entire cost of the materials acquired for the contract with the Government, leaving it with no loss attributable to the Ferer transaction or “settlement.”
Substantial evidence supports the Board’s decision disallowing both the claimed profit and loss. No error appears in the award.

 Rated orders and contracts are a method, associated with the Defense Materials System and the Business and Defense Services Administration, by which purchase orders for defense supplies may be placed on selected suppliers. See ASPR 1-307, 32 CFR § 1.307 (1970).

 An explanatory “statement of facts” by the contracting officer, not a part of the record, is attached to the Government’s brief. Having agreed to the decision of the breach claim on the record before the Board, the Government may not supplement the record with any data, much less an unsworn statement by a new witness who had not been cross-examined. The “statement of facts” will not be considered. Northbridge Electronics, Inc. v. United States, 195 Ct. Cl. 453, 463, 444 F. 2d 1124, 1130 (19.71) ; Rice v. United State, 192 Ct. Cl. 903, 910, 428 F. 2d 1311, 1315 (1970).

 The Board’s findings are adopted as correct in their entirety. There is no need, therefore, to consider whether the findings relevant to the claim of breach are entitled to finality as relevantly made in the decision of a dispute properly before the Board (United States v. Utah Constr. & Mining Co., 384 U.S. 394 (1966)) or not so made and therefore having no finality (e.g., National Steel & Shipbuilding Co. v. United States, 190 Ct. Cl. 247, 261-62, 419 E. 2d 863, 872 (1969)).

 The clause in the contract is incorporated by reference to ASPR 7 — 103.21(e) (April 1966), 32 CEK §§ 7.103-21 (e), 8.701(a) (1970) (Termination for Convenience of the Government, April 1966). It provides in part as follows:
“(a) The performance of work under this contract may be terminated by the Government in accordance with this clause in whole, or from time to time in part, whenever the Contracting Officer shall determine that such termination is in the bset interest of the Government. * * *”