GROSS, J.
Between 2008 and 2009, Broward County redesigned a government program to realize over $11 million in savings for taxpayers. For this exercise of fiscal respon *532 sibility, the County was sued by the appellants, Handi-Van, Inc., and Village Car Service, Inc., two providers under the scrapped program, whose bids were too high for participation in the revamped program. Every federal and state judge who has ruled on the appellants’ various legal claims arising from this case has rejected them. We join these other courts and affirm the final summary judgment of the circuit court.
Under the Americans with Disabilities Act,[1] all local governments that operate fixed-route transportation systems for the general public are required to provide alternative paratransit services for the physically or mentally disabled.[2] While many governmental entities fulfill this requirement by developing in-house personnel, Broward County outsourced these services by contracting with private entities, including the appellants. Such relationships commenced in December 1996 and continued in December 2001, when in both instances the County entered into five-year contracts with the appellants, with the latter contract set to expire on December 31, 2006. At their peak, Village Car and Handi-Van performed 21% and 19% of the County’s paratransit services respectively.
In April 2006, as the last contract neared expiration, Broward County circulated a request for letters of interest to providers of paratransit services. When the procurement process took longer than expected, the County extended all existing paratransit contracts an additional year, through the end of 2007. Eventually, the County contracted with nine paratransit providers, including the appellants, and invited the parties to engage in negotiations.
After negotiations commenced, Broward County halted contracting with the appellants after becoming concerned that their addition might compromise the County’s ability to maintain a Disadvantaged Business Enterprise (“DBE”) program, a requirement for recipients of federal funding, since the appellants likely would not fall within the enumerated “good faith” exception.[3] As a result, on January 30, 2008, the appellants initiated a lawsuit in the United States District Court for the Southern District of Florida, seeking declaratory and injunctive relief to prevent the County from considering minority character or membership when evaluating its bids.
With the federal suit pending, the County, in June 2007, entered into five-year contracts with the other seven paratransit providers at a higher rate than before. In addition, county commissioners voted to temporarily extend the appellants’ “contracts to allow time for the County Attorney to obtain guidance from the U.S. De *533 partment of Transportation (‘USDOT’) on whether [the appellants] had satisfied the good faith exception.” Handi-Van, Inc. v. Broward Cnty., Fla., 2010 WL 2382909, at *2 (S.D.Fla. June 14, 2010).
Four months later, Broward County received such guidance from the federal government, learning that “the USDOT did not require DBE goals in the paratransit contracts because federal funding was not being used for the paratransit program.” Id. With the hurdles thus removed, the parties once again engaged in negotiations.

The Change in the Economic Climate ■

In January 2008, while negotiations remained ongoing, Florida voters approved “Amendment One” to the Florida Constitution, which doubled homestead property tax exemptions, allowed homeowners to transfer their “Save Our Homes” benefit, and capped tax increases on commercial and other non-homestead property. The result was a $50 million loss to the County in property taxes, the primary source for the paratransit funding.
Facing an economic crisis, County Commissioners convened on February 5, 2008, to consider scaling back its costly para-transit system. At that point, Broward County maintained an award-winning “rider’s choice” paratransit system, which allowed users to select whichever provider they wished regardless of where the person was located or where he or she was heading. While much heralded, the system resulted in massive expenses; the new 2007 contract alone cost the County $28,945,745 in one year, making the para-transit system the county’s largest contractual service expense. Recognizing that such financial extravagance could no longer be maintained, the commissioners elected to terminate for convenience the contracts of all of its paratransit providers once a cheaper paratransit system had been developed.

The New Contract

With the decision to terminate the contracts in the future set in stone three weeks prior, the appellants signed a five-year contract with the County to apply retroactively to July 1, 2007, placing the appellants in the same position as the other seven paratransit providers. Much like the previous seven contracts, the appellants’ contract contained a termination for convenience provision, which permitted Broward County to terminate the contract for convenience upon ninety (90) days notice and identified consideration for the County’s right to so terminate.[4] Unlike the previous seven contracts, however, the appellants’ contract differed in that it contained the following addendum, which memorialized the County Commission’s February 5, 2008 decision to terminate the contract once a less-costly paratransit system had been developed:
*534 On February 5, 2008, the Broward County Board of County Commissions directed COUNTY staff to terminate for convenience contracts for paratransit services. No notice of termination has been sent to any provider of paratransit services, but it is expected that such notice will be provided at some point subsequent to the execution of the Agreement and this Addendum. Nothing in this Agreement or any addenda between the parties shall in any way affect the County’s right to terminate the Agreement (and the addenda and any subsequent amendments) for convenience, consistent with the terms and conditions of the Agreement.
Particularly when taken in conjunction with the parties’ documented correspondences, this provision demonstrates that the appellants entered into their contracts with full understanding of the County’s intention to terminate the contracts upon completion of the cost-saving system.

Termination and Development of the ‘Virtual Fleet”

Over the ensuing fifteen months, the County developed the concept of a “virtual fleet,” which differed from the previous “rider’s choice” model in that it functioned much like a taxi cab dispatch, assigning trips based on proximity and efficiency, rather than the users’ “choice.” The plan anticipated savings of $400,000 to $500,000 per month.
Once the system had been fine-tuned, the County requested interested paratran-sit providers to submit sealed bids, stating their cost to perform under the new “virtual fleet.” Twenty-four firms, including the appellants, submitted bids, and the County awarded the paratransit contracts to the five lowest bidders; Village Car and Handi-Van were not selected as they submitted the highest and fourth highest bids respectively. With the new contracts set, the County formally gave all nine para-transit providers 90-days notice of its plan to terminate their current contracts for convenience by the end of 2009.

The Current Case

Unhappy with their lot, the appellants filed another federal suit, this time claiming six grounds of relief, including the assertion that Broward County breached its contract by invoking its ability to terminate for convenience without a change in circumstances. See generally Handi-Van, Inc., 2010 WL 2382909. On appeal, the Eleventh Circuit Court of Appeals affirmed the district court’s decision to grant summary judgment in favor of Broward County on five of the claims, but remanded the breach of contract claim to be decided by a Florida court since the issue was one of state law. Handi-Van Inc. v. Broward Cnty., Fla., 445 Fed.Appx. 165, 170 (11th Cir.2011).
On remand, the appellants submitted an amended complaint which sought damages for Broward County’s wrongful termination/breach of contract. With the facts largely fleshed out in the federal courts, both parties filed motions for summary judgment.
In support of their motion for partial summary judgment, the appellants relied upon the previously-submitted affidavits of the president of Village Car and an officer of Handi-Van, both of whom alleged that once Broward County decided to terminate the paratransit contracts on February 5, 2008, the County “commenced negotiations with other providers in order to get them to increase their respective ridership.” However, “when these negotiations failed[, the County] commenced renegotiations with the [appellants.]” Thereafter, once the new contracts were agreed upon, Bro-ward County notified the appellants of its decision to terminate, despite relying on *535 “the same grounds for termination (i.e., passage of ‘Amendment 1’) as were approved at its February 5, 2008 meeting more than one year before.”
Broward County, on the other hand, had previously submitted numerous affidavits from individual county commissioners and the minutes and transcripts of the meetings where the issues of this case were detailed. In their affidavits, the commissioners averred that the decision to terminate the appellants’ contracts stemmed from the passage of Amendment One and “was purely for financial reasons.” Under such straits, the commissioners decided to transform from the “rider’s choice” system to the “virtual fleet” model, since prognosticators had anticipated millions of dollars in annual savings. Such sentiment was backed by the transcripts of the meetings themselves.
After conducting a hearing, the trial court entered an order granting Broward County’s motion for final summary judgment, and denying that of the appellants. The trial court later entered a final judgment effectuating its prior ruling.
I
On appeal, the appellants contend the trial court erred in granting summary judgment in the County’s favor since allowing the County “to invoke the ‘termination for convenience’ clause ... without a new circumstance and for pre-contractual reasons, renders the contracts illusory.” To support this argument, the appellants contend that this Court should adopt the first of two standards that have developed primarily in the federal courts to analyze the propriety of a government entity’s decision to terminate for convenience: (1) whether there was a “change in circumstances” since entering into the contract which justified the termination or (2) whether the government entity exercised its right to terminate in “bad faith.” Since this issue presents a pure question of law, our review is de novo. Sierra v. Shevin, 767 So.2d 524, 525 (Fla. 3d DCA 2000).
We conclude that the case is properly decided under state contract law. Even if we were to follow federal law, the “bad faith” standard would apply, so the result would not change — the trial court properly entered summary final judgment.
II
“Termination for convenience” clauses are contractual provisions which “permit one party to terminate a contract, even in the absence of fault or breach by the other party, without suffering the usual financial consequences of breach of contract.” Harris Corp. v. Giesting & Assocs., Inc., 297 F.3d 1270, 1272 (11th Cir.2002) (interpreting Florida law). While typically the product of the parties’ free negotiations, such provisions have become a mandatory fixture of federal government procurement contracts, necessitating the need for judicial limitation. See Capital Safety, Inc. v. State, Div. of Bldgs. & Constr., 848 A.2d 863, 866 (N.J.Super.Ct.App.Div.2004).
The conferment of such authority to terminate “dates back to the Civil War where it developed as a tool for the United States government to avoid costly military procurements that were rendered unnecessary by changing war-time technology or by the cessation of conflict.” Vila & Son Landscaping Corp. v. Posen Constr., Inc., 99 So.3d 563, 566 (Fla. 2d DCA 2012) (citing Krygoski Constr. Co. v. United States, 94 F.3d 1537, 1540 (Fed.Cir.1996)). Beginning with United States v. Corliss Steam-Engine Co., 91 U.S. 321, 23 L.Ed. 397 (1875), the Supreme Court conferred upon government contracting officers the inherent authority to suspend and terminate contracts during war-time, finding as *536 grounds that “procuring agencies must have the power to settle contracts that have been subjected to great changes in expectation.” Torncello v. United States, 231 Ct.Cl. 20, 681 F.2d 756, 764 (1982). With such power in hand, the Corliss doctrine “expanded into a very important part of military procurement” during World War I, id., as Congress extended “the government’s power to terminate contracts into a right to terminate during wartime.” Stephen N. Young, Limiting the Government’s Ability to Terminate for Its Convenience Following Torncello, 52 Geo. Wash. L.Rev. 892, 894 (1984) (footnote omitted and emphasis added). Thereafter, following World War II, “the use of such termination for convenience provisions expanded into both peacetime military procurement and later into all other realms of Government procurement contracts.” Ginicorp v. Capgemi Gov’t Solutions, LLC., 2007 WL 1660364 (Va.Cir.Ct. Jan.2, 2007) (citing Torncello, 681 F.2d at 765). Termination-for-convenience clauses are presently included, either impliedly or expressly, in all United States government fixed-price or service contracts. See 48 C.F.R. § 49.502 (2012).

Limitations on the Government’s Authority to Terminate for Convenience

In its earliest “war-time” contemplation, “the consensus remained that the government’s right to terminate a contract was justified by the exigencies and uncertainties of armed conflict.” Questar Builders, Inc. v. CB Flooring, LLC, 410 Md. 241, 978 A.2d 651, 666 (2009). However, as such clauses became mandatory for government contracts at-large, the federal courts looked less to the exigencies surrounding the termination, and more to whether the government exercised its authority in bad faith. See, e.g., Jacobs v. United States, 239 F.2d 459, 461 (4th Cir.1956), cert. denied, 353 U.S. 904, 77 S.Ct. 666, 1 L.Ed.2d 666 (1957); Librach v. United States, 147 Ct.Cl. 605, 614, 1959 WL 7633 (1959); Kalvar Corp. v. United States, 211 Ct.Cl. 192, 543 F.2d 1298, 1301 (1976).
“[T]he high-water mark of [the] courts’ permissiveness in allowing the government to terminate for convenience,” Liman-Faye Constr. Co. v. Hous. Auth. of City of Camden, 49 F.3d 915, 924 (3d Cir.1995), was reached in Colonial Metals Co. v. United States, 204 Ct.Cl. 320, 494 F.2d 1355 (1974), a case “widely perceived as allowing the government to enter into illusory contracts without any limit on its discretionary right to terminate for convenience.” 5 Phillip L. Bruner & Patrick J. O’Connor, Jr., Bruner & O’Connor Construction Law § 18:47 (2012). In Colonial Metals, the Navy terminated its contract with a copper dealer one month after contracting when it found a cheaper source for such services. 494 F.2d at 1357. Although the Navy knew of the cheaper source before contracting with the plaintiff, the federal Court of Claims upheld the Navy’s right to terminate for convenience, reasoning that, unless bad faith on the part of the government has been shown, “[t]er-mination to buy elsewhere at a cheaper price is essentially such a termination as has repeatedly been approved.” Id. at 1361.
Recognizing the far-reaching and unrestricted ramifications of Colonial Metal’s holding, the Court of Claims revisited the issue just eight years later in Torncello, 231 Ct.Cl. 20, 681 F.2d 756. There, the plaintiff-contractor entered into a requirements contract with the Navy to provide insect and rodent control, with the plaintiff set to be paid $500 each time it was called. Id. at 758. As it turned out, the Navy only required assistance removing gophers from six housing projects, “work that was *537 customarily much cheaper than $500”;[5] thus, the Navy constructively terminated the contract for convenience by contracting with an alternative, cheaper source, in turn immediately diverting the bargained-for service away from the plaintiff. Id.
Sitting en bane, the Court of Claims ruled that the Navy breached its contract via four separate opinions, with the lead opinion garnering support from only three of the court’s six judges. In retreating from Colonial Metals, Judge Bennett, writing for the plurality, undertook a historical analysis of the federal government’s authority to employ termination-for-con-venienee clauses, centering upon the proposition that “the convenience termination clause developed as a wartime concept” to allow “the government to avoid the continuance of contracts that the rapid changes of war, or the war’s end, had made useless or senseless.” Id. at 763. Such history led Judge Bennett to reason, in dicta, that Colonial Metals was “an aberration in the precedents of the court” and “a clear break with all of the prior law on the subject,” since prior cases had permitted “termination for convenience only when the expectations of the parties had been subjected to a substantial change.” Id. at 766-68.
In conformity with this line of thought, Judge Bennett rejected the “bad faith” test used in Colonial Metals, explaining that such a test is a fagade where the government is presumed to act in good faith.[6] Id. at 771. Thus, the infirmity that poisoned Colonial Metals and like precedent was two-fold. First, the government’s grant of plenary power to terminate subject to a “bad faith” limitation created an “illusory promise,” since “the government’s promise to turn to [the plaintiff] for all of its pest control work, if it was also implicit in the termination for convenience clause that the government could give [the plaintiff] none, was no promise at all.” Id. at 769. Second, in the absence of an independent source of consideration, the contract “would fail for the lack of any binding obligation.” Id. at 772. Thus, to quell both problems, the court read into termination for convenience clauses the requirement of “some kind of change from the circumstances of the bargain or in the expectations of the party.” Id.

Tomcello’s Reception and Eventual Detraction

Despite such concerns, “[i]n subsequent cases, the court of claims[, along with other federal courts,] has dismissed much of what it discussed in Torncello and ... clarified that bad faith, not changed circumstances, limits the government’s ability to terminate for convenience.” Vila & Son Landscaping, 99 So.3d at 568 (citing Krygoski, 94 F.3d at 1541-42). Eight years following Torncello, the United States Court of Appeals for the Federal Circuit, *538 in Salsbury Industries v. United States, 905 F.2d 1518, 1521 (Fed.Cir.1990), limited Torncello’s holding, finding that it stood for the “the unremarkable proposition that when the government contracts with a party knowing full well that it will not honor the contract, it cannot avoid a breach claim by adverting to the convenience termination clause.” Likewise, in Caldwell & Santmyer, Inc. v. Glickman, 55 F.3d 1578, 1582 (Fed.Cir.1995), the Federal Circuit again approved such treatment, interpreting Salsbury to stand for the proposition that “bad faith ... is a prerequisite for a Torncello claim.”
Any doubt as to the applicable standard that may have remained was then eliminated by the Federal Circuit’s decision in Krygoski, 94 F.3d 1537. There, the court reviewed the termination for convenience jurisprudence, finding that it “discloses mixed signals about limiting terminations under the bad faith/abuse of discretion standard ... or the change of circumstances test in Torncello.” Id. at 1540. The court noted, however, that such “mixed signals” had been cleared up by its decision in Salsbury, which “revisited the dicta in the Torncello plurality opinion” and rejected its reasoning. Id. at 1543. As a result, much like Salsbury, the Krygoski court reaffirmed that termination for convenience disputes should be reviewed for bad faith, and that “Torncello applies only when the Government enters into a contract with no intention of fulfilling its promise.” Id. at 1545 (citing Salsbury, 905 F.2d at 1521) (emphasis added). Subsequent cases have followed suit. See TigerSwan, Inc. v. United States, 110 Fed.Cl. 336, 345 (2013) (“The Federal Circuit-and the former Court of Claims-have recognized that an improper termination for convenience may give rise to a breach of contract claim when the agency (1) terminates the contract in bad faith or (2) abuses its discretion in its decision to terminate the contract.” (citations omitted)); T & M Distribs., Inc. v. United States, 185 F.3d 1279, 1284 n. 4 (Fed.Cir.1999) (“We have in fact rejected the suggestion that dicta of a plurality opinion in Tomcello imposed a special requirement of ‘changed circumstances’ on the government’s right to terminate for its convenience.”); Custom Printing Co. v. United States, 51 Fed.Cl. 729, 734 (2002) (“Only evidence that the contracting officer acted in bad faith or engaged in a clear abuse of discretion will be sufficient to merit summary judgment for the contractor.” (citations omitted)).
The appellants thus rely on a case that has been substantially limited by the federal courts.
The Termination Clause Was Supported by Consideration
As can be seen through this jurisprudence’s development, while the federal government’s authority to invoke termination-for-convenience provisions has been “broadly construed ... to authorize termination for any reason that is in the best interests of the government,” Capital Safety, Inc., 848 A.2d at 866, limitations upon such power are necessary to protect contracting parties from the government’s otherwise “open license to dishonor contractual obligations.” Maxima Corp. v. United States, 847 F.2d 1549, 1553 (Fed.Cir.1988); Kisco Co. v. United States, 221 Ct.Cl. 806, 610 F.2d 742, 754 & n. 6 (1979). The concerns necessitating such jurisprudence, therefore, derive not from the government’s status as a “government entity,” but as an effort to reign back on the government’s non-negotiable, statutorily-conferred entitlement to terminate its contracts as it pleases. See Questar, 978 A.2d at 669. Notably, if the bad faith limitation were not in place, all parties seeking to contract with the federal government would be forced, without the benefit of *539 negotiation, to endure termination at the government’s whim, even if such decision proved patently unjustifiable.
In this case, the contractual landscape facing the appellants was quite different. Contrary to the appellants’ assertions, Broward County lacked the legislative authority to terminate its contracts with the appellants, as the County was only required to add termination-for-convenience clauses for construction contracts. See Broward County, Florida Admin. Code § 21.70 (2012) (“All construction contracts for Broward County shall contain clauses allowing for the termination of the contract for convenience and prescribe methods in which the vendor may calculate cost of work already performed, and termination settlement costs.” (emphasis added)). The contracts here at issue are not construction contracts. As a result, reliance upon the federal cases is inappropriate, since the appellants were placed on equal footing with the County to negotiate the inclusion, or exclusion, of the termination clause.
Absent the plenary power conferred upon the United States government through the federal procurement statutes, the contracts here at issue are best analyzed under Florida contract law. See Vila & Son Landscaping, 99 So.3d at 566. Applying such principles, “[i]t is well settled that courts may not rewrite a contract or interfere with the freedom of contract or substitute their judgment for that of the parties thereto in order to relieve one of the parties from the apparent hardship of an improvident bargain.” Beach Resort Hotel Corp. v. Wieder, 79 So.2d 659, 663 (Fla.1955) (citations omitted). Moreover, such freedom of contract “includes freedom to make a bad bargain.” Posner v. Posner, 257 So.2d 530, 535 (Fla.1972).
As applied to the termination provision at hand, “Florida courts have upheld the unilateral right of one party to cancel a contract as long as consideration exists,” even where mutuality of termination is lacking. Avatar Dev. Corp. v. De Pani Constr., Inc., 834 So.2d 873, 875 (Fla. 4th DCA 2002). Such consideration “need not be money or anything having monetary value, but may consist of either a benefit to the promisor or a detriment to the promisee.” Real Estate World Fla. Commercial, Inc. v. Piemat, Inc., 920 So.2d 704, 706 (Fla. 4th DCA 2006) (quoting Lake Sarasota, Inc. v. Pan Am. Sur. Co., 140 So.2d 139, 142 (Fla. 2d DCA 1962)). Thus, the requirement that one party fore-go exercising its contractual right to terminate until after proper notice has been given has been deemed sufficient consideration to support execution of a termination clause. See, e.g., Bossert v. Palm Beach Cty. Comprehensive Comm. Mental Health Ctr., Inc., 404 So.2d 1138, 1139 (Fla. 4th DCA 1981) (finding the requirement of two weeks notice of the right to terminate or restrict to be sufficient consideration as to avoid a lack of mutuality); Rollins Servs. v. Metro. Dade Cty., 281 So.2d 520, 521 (Fla. 3d DCA 1973) (upholding Miami-Dade County’s contractual right to terminate a contract “at any time,” since the provision required the county to give written notice to the contractor ten days prior to termination).
Here, Broward County’s contracts with the appellants required that 90 days written notice be given prior to termination. Such written notice, by itself, constituted sufficient consideration to uphold the provision’s enforcement. In addition, at the time they were entered into, the contracts obviously contemplated early termination and included $10 as “special consideration” for the County’s right to terminate for convenience, a separate basis to enforce the provision. The trial court’s *540 order granting summary judgment was proper.

The Termination Provision Did Not Create an Illusory Contract

Given the existence of consideration, the appellants’ corollary argument that the termination-for-convenience clause constitutes an illusory promise is equally unfounded. “A contract is illusory under Florida law when ‘one of the promises appears on its face to be so insubstantial as to impose no obligation at all on the promisor-who says, in effect, ‘I will if I want to.’ ” Princeton Homes, Inc. v. Virone, 612 F.3d 1324, 1331 (11th Cir.2010) (quoting Johnson Enters. of Jacksonville, Inc. v. FPL Group, Inc., 162 F.3d 1290, 1311 (11th Cir.1998)). “[W]here the consideration for a promise of one party is the promise of the other, there must be absolute mutuality of engagement, so that each party has the right to hold the other party to a positive agreement.” Miami Coca-Cola Bottling Co. v. Orange-Crush Co., 291 F. 102, 103 (S.D.Fla.1923), aff'd, 296 F. 693 (5th Cir.1924). However, “where there is any other consideration for the contract, mutuality of obligation is not essential.” LaBonte Precision, Inc. v. LPI Indus. Corp., 507 So.2d 1202, 1203 (Fla. 4th DCA 1987) (citing Wright & Seaton, Inc. v. Prescott, 420 So.2d 623, 626 (Fla. 4th DCA 1982)).
In this case, Broward County’s termination-for-convenience clause was independently supported by consideration, debunking any claim of its illusory nature. See Vila & Son Landscaping, 99 So.3d at 568 (finding a similar argument to “fail[ ] because under Florida law a provision requiring written notice, such as that contained in the termination clause in question here, prevents the promise made by the party with the right of termination from being regarded as illusory in nature”). Since Broward County properly exercised its contractual right to terminate the appellants’ contract for convenience, the trial court’s order must be affirmed.
Ill
Nevertheless, even if we were to follow the federal courts in this case, summary judgment would have been proper since Broward County did not act in bad faith. Under federal jurisprudence, “[t]he contractor’s burden to prove the Government acted in bad faith ... is very weighty.” Krygoski, 94 F.3d at 1541 (citing Kalvar, 543 F.2d at 1301). While government officials, “when ... contract[ing] with their citizens, are controlled by the same laws that govern the citizen in that behalf,” United States v. Bostwick, 94 U.S. 53, 66, 12 Ct.Cl. 67, 24 L.Ed. 65 (1876), they are also “presumed to act in good faith, and ‘it requires well-nigh irrefragable proof to induce the court to abandon the presumption of good faith dealing.’ ” T & M Distribs., 185 F.3d at 1285 (quoting Kalvar, 543 F.2d at 1301-02). This standard “sets a high hurdle for a challenger seeking to prove that a government official acted in bad faith,” and has been “equated with evidence of some specific intent to injure the plaintiff.” Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1240 (Fed.Cir.2002) (quoting Kalvar, 543 F.2d at 1302). “Due to this heavy burden, contractors have rarely succeeded in demonstrating the Government’s bad faith.” Krygoski, 94 F.3d at 1541.
In bringing such a suit, “the contractor must present clear and convincing evidence that the government’s termination was made with the ‘intent to injure’ the contractor.” TigerSwan Inc., 110 Fed.Cl. at 345 (citing Am-Pro Protective Agency, Inc., 281 F.3d at 1239-40); see also N. Star Alaska Hous. Corp. v. United States, *541 76 Fed.Cl. 158, 187 (2007). While this is typically the case, recent cases, relying upon Krygoski, have found liability to also be warranted “where the government has engaged in some form of improper self-dealing for its own benefit or to benefit another contractor,” in other words, preventing the government from repeating the infirmity of Colonial Metals and Torncello. TigerSwan, 110 Fed.Cl. at 347; see also Questar Builders, Inc., 978 A.2d at 668 (stating that Krygoski’s holding “add[ed] some teeth to the ‘bad faith/abuse of discretion’ standard”). However, when this exception is implicated, a showing of prior “government knowledge that it will not honor the contract is a prerequisite.” TigerSwan, 110 Fed.Cl. at 347 (citing Caldwell, 55 F.3d at 1582).
In the case at hand, if Broward County were to be found liable at all, it would have to be under the latter exception, since the appellants failed to evince any facts depicting the County’s intent to “injure” them. While the addendum to the appellants’ contract evidences the County’s intent to terminate the contract within the five-year period, it also demonstrates the intent to honor the contract until a change in circumstance, namely the development of the “virtual fleet,” occurs. This fact distinguishes this case from the onerous situation presented in Colonial Metals and Torncello, where the government crushed the contractor’s bargained-for expectations by entering into the contract despite knowing it would not honor á portion of it at all. Here, the appellants’ eyes were open when they entered into the contracts, as they knew, per the addendum, that their contract would be terminated at a later point based on the County’s good faith economic reason for so acting.
IV
As their final issue, the appellants contend that the trial court erred in granting summary judgment since issues of fact remained as to whether they were entitled to “reliance damages” for the amount they had spent upgrading their fleet to conform with the contract. In Florida, to show entitlement to damages under a breach-of-contract theory, the plaintiff must “prove by a preponderance of the evidence the existence of a contract, a breach, and damages flowing from the breach.” Carpenter Contractors of Am., Inc. v. Fastener Corp. of Am., Inc., 611 So.2d 564, 565 (Fla. 4th DCA 1992) (citing Knowles v. C.I.T. Corp., 346 So.2d 1042 (Fla. 1st DCA 1977)) (emphasis added). Here, the appellants facially failed to meet this burden since Bro-ward County did not breach its contract by invoking its right to terminate. Id.
In reality, the appellants attempt to invoke the federal doctrine which, relying upon federal statutes, entitles the terminated party to certain costs upon application of the termination-for-convenience clause. However, even with federal contracts, “[w]here the government terminates a private contractor pursuant to a termination for convenience clause in a contract, ... the contractor’s recovery is defined by the termination for convenience clause.” Linan-Faye Constr. Co., 49 F.3d at 923 (emphasis added). Here, since Florida’s statutes do not supply an alternative remedy after a termination clause is executed, the appellants are left to their bargained-for, contractual remedy of ninety-day notice and payment “for any services performed to the date the Agreement is terminated.” See, e.g., EDO Corp. v. Beech Aircraft Corp., 911 F.2d 1447, 1453 (10th Cir.1990) (stating that where the concerns of the federal cases is lacking, “we will enforce a contract freely entered into by two competent parties” when sup *542 ported by consideration). Appellants were paid in full for all work performed under the contract prior to termination, making millions of dollars in the process. The remedies conferred under the contract were effectively met making summary final judgment appropriate.

Affirmed.

FORST, J., and ROSENBERG, ROBIN, Associate Judge, concur.

. See 42 U.S.C. §§ 12.101-12.213 (2006).

. While traditional mass transit systems such as buses and subways run on set schedules, paratransit services envision "transportation ... upon request by the handicapped individual,” including, but not limited to, "wheelchair-accessible vans.” Walter v. Se. Penn. Transp. Auth., 434 F.Supp.2d 346, 351 (2006) (quoting ADAPT v. Skinner, 881 F.2d 1184, 1186 n. 1 (3d Cir.1989)).

. “Generally speaking, to qualify as a DBE, the owner must be a citizen of the U.S., a woman or racial or ethnic minority, who is socially and economically disadvantaged.” Handi-Van, Inc. v. Broward Cnty., Fla., 2010 WL 2382909, at *1 (S.D.Fla. June 14, 2010). "Through the DBE program, it has been the longstanding policy of the United States Department of Transportation to expend not less than 10 percent of the amounts authorized to be appropriated for certain federal ... programs with small business concerns owned and controlled by socially and economically disadvantaged individuals.” Cache Valley Elec. Co. v. State of Utah Dept. of Transp., 149 F.3d 1119, 1121 (10th Cir.1998) (citations and internal quotations omitted).

. Specifically, the contract provided as follows:
15.1 This Agreement may be terminated for cause by action of the Board or by CONTRACTOR if the party in breach has not corrected the breach within fourteen (14) days after written notice from the aggrieved party identifying the breach, or for convenience by action of the Board upon not less than ninety (90) days written notice. ...
[[Image here]]
15.4 In the event this agreement is terminated for convenience, CONTRACTOR shall be paid for any services performed to the date the Agreement is terminated; however, upon being notified of COUNTY’S election to terminate, CONTRACTOR shall refrain from performing further services or incurring additional expenses under the terms of this Agreement. CONTRACTOR acknowledges and agrees that Ten Dollars ($10.00) of the compensation to be paid by COUNTY, the receipt and adequacy of which is hereby acknowledged by CONTRACTOR, is given as special consideration to CONTRACTOR for COUNTY'S right to terminate this Agreement for convenience.

. While the court’s finding is generally true, it should be noted that there are instances where gopher removal may be costly, particularly when animal-shaped C4 explosives are required. See Caddyshack (Orion Pictures 1980) (chronicling groundskeeper Carl Spack-ler’s extensive attempts to exterminate a gopher, resulting in the destruction of Bush-wood Country Club).

. As Judge Bennett explained:
[T]he government’s obligation to act in good faith hardly functions as the meaningful obligation that it may be for private persons. Since good faith is presumed unless bad faith is shown, the government is prevented only from engaging in actions motivated by a specific intent to harm the plaintiff. It does not seem enough to support the government’s claim for otherwise unlimited convenience termination for the government only to promise not to use it specifically to damage the contractor.
Torncello, 681 F.2d at 771.